ORDER
 

 MARTIN, District Judge.
 

 This action alleging wrongful denial of disability insurance benefits, failure to disclose, breach of fiduciary duty, and interference with other employment benefit plans is before the court on (a) Defendant’s Motion for Summary Judgment [Doc. No. 44]; (b) Plaintiffs Motion for Summary Judgment [Doc. No. 46]; (c) Plaintiffs Motion to File Certain Documents Under Seal [Doc. No. 69]; (d) Joint Motion of Plaintiff and Dr. Robert C. Porter, MD and Network Medical Review to Treat as Confidential and Protected (1) the Deposition of Robert C. Porter, MD, Owner of Network Medical Review and (2) the Documents Produced by Dr. Porter and Network Medical Review [Doc. No. 72]; (e) Plaintiffs Motion for Leave to File a Reply Brief [Doc. No. 74]; and (f) Reese & Reese’s Motion to Withdraw [Doc. No. 76].
 

 
 *1287
 
 1.
 
 Factual and Procedural Background
 

 The facts presented here are excerpted from the parties’ Statements of Material Facts attached to their Motions for Summary Judgment as well as the court’s independent review of the record and are undisputed except where otherwise noted.
 
 [2]
 

 A. Plaintiffs Medical History
 

 In June 1985, Plaintiff Eileen Hamall-Desai (“Plaintiff’ or “Desai”
 
 [3]
 
 ) suffered a Type II hangman’s fracture
 
 [4]
 
 at the C2-C3 vertebrae of the neck with subsequent segmental C2-C3 instability, facet
 
 [5]
 
 joint dysfunction, and cervical
 
 [6]
 
 myofascial
 
 [7]
 
 pain syndrome. She sought various treatments for her pain symptoms, including facet joint injections, epidural steroid injections, nerve blocks,
 
 [8]
 
 massage therapy, aquatic exercise, and acupuncture. Desai also took various prescription pain medications. In the years following her injury, Desai was able to manage her pain, but, according to Desai, beginning in January 1996, her pain never ceased for more than two months, and she began suffering side effects from the pain management techniques. Beginning on March 4, 1998, she was receiving regular epidural steroid injections and a nerve block, but she asserts she did not experience lasting pain relief from these treatments. On April 1, 1998, Desai began working on projects
 
 [9]
 
 from home because of her condition, which she asserts prevented her from working in the office.
 

 B. Plaintiffs Occupation and the Benefits Plan
 

 Desai was employed by Alumax as a Manager of Information Systems (“MIS”) in the Corporate Information Services Department from 1992 until 1998. The MIS position is classified as sedentary by For-tis, which means an individual in the position can sit and stand at will but will spend most of the day sitting. Desai asserts that the position does not allow for sitting and standing at will. Desai’s occupational objectives included managing installation of centralized/monitored Internet access; working with members of the Information Technology Committee to develop an implementation plan for improved technology strategies; managing transition and relocation of network, systems, voice and data communications; and determining hardware, software, and end user training re
 
 *1288
 
 quirements. Because Alumax was closing its Buckhead office, in which Desai was employed, her position was going to be eliminated in October 1998.
 

 Desai was a “Class 1 covered person” under an employee welfare benefits plan known as the Alumax Group Long Term Disability Insurance Plan (“Plan”), for which Fortis Benefits Insurance Company (“Fortis”) was the insurer. Fortis denies that it acted as the Plan administrator, but it admits that it exercised decision-making power in claims determinations. Claims made under the Plan are governed by the Employee Retirement Income Security Act of 1974 (“ERISA”).
 
 See
 
 29 U.S.C. §§ 1001,
 
 et seq.
 

 The Plan vests discretion with Fortis to determine eligibility for disability benefits. It states: -
 

 Authority
 

 We have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. A1 determinations and interpretations made by us are conclusive and binding on all parties.
 

 The Plan classifies an individual as disabled if she meets the Occupation Test, which states:
 

 during the first 30 months of a period of disability (including the qualifying period), an injury, or sickness, or pregnancy requires that you be under the regular care and attendance of a doctor, and prevents you from performing at least one of the material duties of your regular occupation.
 
 [10]
 

 Material duties are defined as “the set of tasks or skills required generally by employers from those engaged in a particular occupation .... ” Further, the Plan provides that “[o]ne material duty of your regular occupation is the ability to work for an employer on a full-time basis.” The Plan defines “full-time” as “working at least 30 hours per week.” If a participant qualifies as disabled, the Plan provides monthly benefits, calculated as a percentage of salary.
 
 [11]
 

 Despite her injury and reported pain, Desai had been working full-time at Mu-max for years, occasionally taking medical leave when her symptoms worsened. From January to October 1998, Desai asserts she informed Mumax’s human resources department of her worsening condition. In Desai’s letter dated July 28, 1998, she informed Nix of her intent to apply for disability benefits. While it is not material to the court’s findings in this Order, it appears that Desai was awarded medical leave and short-term disability benefits.
 
 [12]
 
 In early 1999,
 
 [13]
 
 Desai applied for long-term disability (“LTD”) benefits under the Plan. The parties dispute what date was listed as the date of disability. Desai asserts the date she first became unable to work due to her disability as April 1, 1998, while Fortis asserts Desai
 
 *1289
 
 claimed she was no longer able to work as of July 28, 1998. It appears to the court, based on an internal memorandum from Byron Ellis (“Ellis”), an employee in the Alumax human resources department, that Ellis suggested using July 28, 1998 as the onset date for disability. Ellis made this decision because of Desai’s scheduled severance date from the company, stating, “If you are ... granted ... medical leave of absence, you will not be severed as presently scheduled to occur on October 6, 1998, but will remain on medical leave.” Fortis contends that when Desai made her LTD claim, she was aware that her position at Alumax had been terminated. De-sai contends she was not aware that her position was being eliminated when she first considered applying for disability benefits.
 
 [14]
 

 On June 6, 1999, Fortis denied Desai’s LTD claim and notified Desai of its appeal policy, which states:
 

 Within 60 days after Fortis Benefits Insurance Company receives a request for review, we will render a decision, unless special circumstances require an extension of time for assessing the evidence, in which case the time limit shall not be later than 120 days after the original written request for review was received.
 

 Fortis provides up to two reviews of any benefits'denial.
 

 On August 4, 1999, Desai appealed the denial. In her appeal, Desai stated that “the issues surrounding [her] inability to perform [her] job are lack of mental alertness due to pain and/or medication side effects and [her] physical inability to perform tasks in a continuous manner.” On October 23, 1999, Desai called Fortis about the status of her appeal. On November 1, 1999, a Fortis representative informed De-sai that he had not received a copy of the appeal and requested that Desai send a copy of appeal to him via facsimile.
 
 [15]
 
 De-sai complied with his request. The next day, a Fortis representative notified Desai that the company had received, the copy of her appeal and apologized for “the mishap.” On November 23, 1999, Fortis denied Desai’s initial appeal.
 

 On January 20, 2000, Desai submitted a second appeal, which Fortis received on January 21, 2000. Fortis asserts it continued to receive additional documentation for consideration from Desai throughout the appeals process..
 

 
 *1290
 
 On May 1, 2000, Fortis requested that Desai undergo a neuropsychological
 
 [16]
 
 examination. Desai objected to the examination because it was untimely and potentially unsafe because she was then pregnant. Nonetheless, Fortis asserts that Desai agreed to consider participation in the testing if Fortis would accept liability for any harm that might occur.
 

 On June 15, 2000, the Social Security Administration determined that Desai has been disabled since April 1, 1998, and For-tis was made aware of the decision in a letter faxed on June 23, 2000. After reviewing all evidence relevant to Desai’s case, Fortis rendered its final decision denying Desai’s second appeal on June 29, 2000. Fortis contends its decision was based on an administrative record that included examination files from Desai’s treating physicians and other medical personnel, a Functional Capacity Evaluation, a Vocational Evaluation, pharmacy records and medication descriptions, a testimonial from one of Desai’s coworkers, surveillance records, and reviews by independent medical and vocational experts hired by or employed at Fortis.
 

 Both parties acknowledge that all administrative avenues of appeal have been exhausted.
 
 [17]
 
 On May 29, 2003, Desai initiated this action for (1) wrongful denial of disability benefits; (2) breach of fiduciary duty against Fortis; (3) interference with other. Alumax employee benefit plans; and (4) failure to provide documents pertinent to Desai’s claim. Fortis denies all allegations. Desai seeks the following relief: (1) past due benefits plus interest, future benefits, and reasonable attorney’s fees and costs; (2) declaratory and injunctive relief; and (3) punitive damages. The parties have submitted cross-motions for summary judgment as well as the various other procedural motions delineated above. The court now considers these motions.
 

 II.
 
 Cross Motions for Summary Judgment
 

 A. Applicable Legal Standard
 

 Summary judgment is proper “if ... there is no genuine issue as to any material fact” and “the moving party is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court is mindful that “Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.”
 
 Id.
 
 The plaintiff must do more than show some level of doubt as to the material facts. “The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.”
 
 Id.
 
 at 252, 106 S.Ct. 2505. As such, the non-movant may not avoid summary judgment with evidence that is “merely colorable or is not significantly probative.”
 
 Raney v. Vinson Guard Serv., Inc.,
 
 120 F.3d 1192, 1196 (11th Cir.1997).
 

 
 *1291
 
 If the nonmoving party fails to “make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,” then the court must enter summary judgment for the moving party.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, “Rule 56(e) ... requires the nonmoving party to ... designate ‘specific facts showing that there is a genuine issue for trial.’ ”
 
 Id.
 
 at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)).
 

 B. Wrongful Denial of Disability Benefits
 

 1. Standard of Review Background
 

 Desai asserts that Fortis wrongfully denied disability benefits, while Fortis asserts its denial was proper. Before reviewing whether the denial of benefits to Desai was improper, the court must first determine what standard of review to apply. ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.
 
 Firestone Tire & Rubber Co. v. Bruch,
 
 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, the Supreme Court has established three distinct standards for reviewing decisions: (1)
 
 de novo
 
 where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion but the administrator operates under a conflict of interest.
 
 See id.
 
 at 115, 109 S.Ct. 948;
 
 Williams v. BellSouth Telecommunications, Inc.,
 
 373 F.3d 1132, 1134 (11th Cir.2004).
 
 [18]
 

 2. Deemed Denial Constituting
 
 De Novo
 
 Review
 

 Desai asserts that Fortis delayed its decisions on appeal, which resulted in a deemed denial warranting
 
 de novo
 
 review. When an application for benefits is not determined within the time allotted by ERISA or the policy, this constitutes a “deemed denial,” which may call for
 
 de novo
 
 review because it may be viewed as a decision for which the adihihistrator exercised no discretion.
 
 Torres v. Pittston Co.,
 
 346 F.3d 1324, 1332 (11th Cir.2003). As the
 
 Torres
 
 court stated, “Some courts have held that ... a deeined denial receives no deference upon judicial review, since the plan administrator did not in fact exercise any discretion ... [while] [o]thers, however, have held that the fact that the denial occurs by operation of ERISA regulations does not alter the otherwise-applicable standard of review.”
 
 Id.
 
 at 1332-33. The Eleventh Circuit, in a footnote, observed that the' Labor Department has taken the position that “a denial occurring without the minimum procedural safeguards provided in the ERISA statutes and regula
 
 *1292
 
 tions should not be reviewed deferentially.”
 
 Id.
 
 at 1333. The
 
 Torres
 
 court did not determine the issue of whether
 
 de novo
 
 review should have been applied by the district court, instead noting that it could not determine from the record why the district court had not applied
 
 de novo
 
 review, speculating that the district court may have thought such action was either legally improper, unwarranted by the facts of the case, or that the court simply ignored the plaintiffs argument regarding standard of review.
 
 Id.
 
 at 1333-34. The court further elaborated on what facts may have justified such a decision.
 

 [T]he decision may ... have turned on a more faet-and-context-specific determination-e.g., that there were ongoing exchanges between the parties warranting time extensions, or that the Insurers here
 
 did
 
 issue a determination (albeit one well past the deadline, but before receiving notice of [claimant’s] suit), which might arguably negate the purpose of applying
 
 de novo
 
 review to an ordinary deemed denial, in which there is no exercise of administrative discretion to be reviewed.
 

 Id.
 

 The ERISA statute and regulations at the time Desai’s claim was considered required only one review of a claim denial.
 
 See
 
 29 U.S.C. § 1133. Regulations promulgated by the Department of Labor provide further directives relating to claim review. “Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim ... and under which a full and fair review of the claim and its denial may be obtained.” 29 C.F.R. § 2560.503-l(g) (2000).
 
 [19]
 
 “A decision ... shall be made promptly, and shall not ordinarily be made later than 60 days after the plan’s receipt of a request for review.” 29 C.F.R. § 2560.503 — l(h)(l)(i) (2000). Additionally, “[i]f special circumstances ... require an extension of time for processing, ... a decision shall be rendered as soon as possible, but not later than 120 days after receipt of a request for review.” Id. Although Fortis has two levels of appeal, its own procedures model those set forth in the relevant regulations.
 

 Before analyzing whether this case involved a deemed denial warranting
 
 de novo
 
 review, the court will briefly restate the facts relevant to this evaluation. For-tis initially denied Desai’s claim on June 6, 1999. Desai appealed the decision on August 4, 1999, but due to an alleged delivery problem, Fortis asserts it did not receive the request for an appeal until November 2, 1999. The court has determined it will consider the November 2, 1999 date as the date of Fortis’ receipt of the appeal. On November 23, 1999, Fortis notified Desai that, based on the review of additional documents, her claim was again denied. On January 20, 2000, Desai appealed the denial a second time. On March 16, 2000, Desai submitted a number of additional medical records for Fortis to consider. Fortis asserts it notified Desai that the appeals committee would be meeting on April 27, 2000, and that she should submit any additional evidence to be considered one week prior to that meeting. Missing that deadline, on April 26, 2000, Desai submitted additional evidence. The appeals committee determined additional investigation was necessary and requested a neuropsychological examination and physician peer review. Fortis notified Desai that additional investigation was needed on May 1, 2000. In a letter dated May 16, 2000, counsel for Desai disputed whether
 
 *1293
 
 Fortis had the right to order a neuropsy-chological examination. On May 31, 2000, Desai again submitted additional records to be considered by Fortis. Fortis issued its final denial of Desai's claim on June 29, 2000.
 

 Desai contends that each of Fortis' appeal decisions was untimely: (1) that her initial appeal of August 4, 1999 should have been decided by October 4, 1999 but was not issued until November 23, 1999; and (2) that her second appeal of January 20, 2000 should have been decided by March 20, 2000 (or May 20, 2000 if special circumstances had been established) but was not issued until June 29, 2000. The court has determined there is no actual dispute over when the appropriate personnel at Fortis received Desai's appeal and will consider Fortis' date of receipt as November 2, 1999. As such, Fortis' November 23, 1999 determination would have been well within the sixty-day limit for review.
 

 Fortis readily admits that the decision on the second appeal was untimely. Fortis notes, however, that the delay was in part due to the continuous submission of information Desai wanted Fortis to consider. The court finds the Eleventh Circuit's dicta in Torres relevant in this case. When the Torres court noted that the district court could have reached its decision that the application of de novo review was improper based on a legal or factual determination, it implicitly recognized that in certain contexts where a determination has been delayed, there are particular facts that would not automatically mandate the application of de novo review. While all parties agree that the second appeal determination was not issued within the prescribed limit, the court finds that the case involves numerous facts that do not favor de novo review. For example, there is evidence in the record that Desai continued to submit evidence supporting her claim for disability throughout the appeals process. The court presumes it would have been possible for Fortis to make a determination within the time limits, but in doing so it would have failed to consider the additional evidence provided by Desai, which would have likely been harmful to Desai. Furthermore, a deemed denial seems more appropriate when there is no administrative decision for the court to review. Here, there were three decisions issued by Fortis, all of which involved some level of discretionary decision-making.
 

 In sum, the court finds that at least some of the delay in Fortis' decision was attributable to the fact that Desai continued to supplement her own record throughout the appeals process. Additionally, this is not a case in which the plan administrator never reviewed the record before it or issued a determination. Accordingly, the court does not find that de novo review due to a deemed denial is appropriate in this case.
 

 3. Determining the Standard of Review
 

 Having settlement that the court does not have to apply de novo review because there was a deemed denial, the court must next determine if heightened arbitrary and capricious review is, as the parties contend, the correct standard to apply. If applicable, heightened arbitrary and capricious review applies to both plan interpretations and factual determinations. See Torres, 346 F.3d at 1329. The Eleventh Circuit has set forth steps for determining the appropriate standard of review. (1) The court should apply the de novo standard to determine whether the claim administrator's benefits denial decision is wrong. If it is not, then the court's inquiry ends and the decision is affirmed. (2) If the administrator's decision is wrong, then the court must determine whether the ad
 
 *1294
 
 ministrator was vested with discretion in reviewing claims. If not, then the court's inquiry ends and the decision is reversed. (3) If the decision was wrong and the administrator was vested with discretion in reviewing claims, then the court must determine whether reasonable grounds supported the decision. If not, then the court's inquiry ends and the decision is reversed. (4) If the decision was based on reasonable grounds, then the court must determine whether the administrator operated under a conflict of interest. If not, the court's inquiry ends and the decision is affirmed. (5) If there is a conflict of interest, then the court must apply the heightened arbitrary and capricious review to the decision and either affirm or deny it. See Williams, 373 F.3d at 1138.
 

 a. De Novo Review
 

 [5] The court has conducted a de novo review of the record reviewed by Fortis in reaching its decision to deny benefits. Generally, a court should not resolve an eligibility question on the basis of evidence not presented to the administrator of an ERISA plan. Jett v. Blue Cross and Blue Shield of Alabama, Inc., 890 F.2d 1137, 1140 (11th Cir.1989). The court evaluated all of the evidence considered by Fortis' appeals committee, which included the following significant items, categorized in terms of which party the evidence favors and summarized by the court.
 
 [20]
 

 Records Generally Favorable to Desai Records from St. Peters Medical
 

 On June 16, 1985, Desai was admitted to St. Peters Medical with a hangman's fracture after being involved in a motor vehicle accident. Desai was placed in a Philadelphia collar and prescribed bed rest. She was released from St. Peters on June 24, 1985.
 

 Records from Dr. Skoczylas
 

 In 1986 and 1987, Dr. M.J. Skoczylas ("Skoezylas"), a medical back care specialist, noted that Desai was experiencing discomfort, tenderness, and muscle spasms associated with the fracture of cervical vertebrae C2 and C3. Skoczylas recommended a course of Ibuprofen, exercise, and physical therapy. He also noted that he believed Desai's injuries to be "permanent in nature" and that "she will have recurrent episodes of discomforts."
 

 Records from Park Physical Therapy
 

 On October 12, 1987, Lisa C. James ("James"), a physical therapist with Park Physical Therapy Associates, Inc., wrote that Desai was seen for seventeen treatments and reported approximately eighty percent overall improvement with an increased range of motion and a marked reduction in muscle tension and trigger nodule activity. Desai also reported no further jaw joint irritation
 
 [21]
 
 or reticular pain into the right upper extremity.
 

 Records from Dr. Wells from 1988 to 1991
 

 Dr. Robert B. Wells ("Wells"), a physician with the Peachtree Orthopaedic Clinic, treated Desai from 1988 to 1990. Because Wells saw Desai on many occasions, the court has summarized below Wells' particular findings from each visit.
 

 
 *1295
 
 a. December 20, 1988: Desai was complaining of periodic neck stiffness and tightness as well as a pain which resulted in diminished function in the right arm associated with numbness and tingling in the hand radiating up the arm.
 

 b. February 22, 1989: Desai called to report that a physical exam had caused neck spasms. Wells called in a prescription for Soma to relieve symptoms.
 

 c. June 30, 1989: Desai’s pain had progressed in the three preceding weeks, resulting in discomfort in her neck and numbness in her fingers. Wells offered to perform a trigger point injection, but De-sai declined.
 

 d. October 18, 1989: Desai was experiencing a flare-up in her neck pain. Wells prescribed Dolobid and stated that he would schedule an appointment for a trigger point injection.
 

 e. March 2, 1990: Desai received a trigger point injection, which relieved stiffness and numbness. Wells stated it would be reasonable to schedule another trigger point injection.
 

 f. November 13,1990: The most recent trigger point injection did not provide adequate relief to Desai. She had noticed a recurrence in numbness of her forearm, and was also experiencing weakness there. Wells recorded that Desai’s problems probably derive from traumatic facet arthritis at C2, C3 with periodic flare-ups of secondary muscle spasms.
 

 g. November 30, 1990: Wells restated his November 13th diagnosis and noted that he believed Desai would require a fusion of the joint. Wells also noted that Desai was undergoing counseling due to stress at work.
 

 Records from Dr. Nirren
 

 Dr. Larry Nirren (“Nirren”), a physician at Piedmont Hospital’s Pain Clinic, treated Desai from 1990 to 1991. Nirren’s findings from each visit are summarized below.
 

 a. October 22,1990: Desai reported six months of good pain relief, but that -she was experiencing tenderness over the paraspinal muscles of C2-C3. Trigger point injections of the C2-C3 - paraspinal muscles were performed.
 

 b. November 9, 1990: Desai had returned, complaining that she had experienced only minimal relief from the last set of injections. Nirren determined she was experiencing neck and facial pain and administered a trigger point injection and a nerve block.
 

 c. January 11, 1991: Desai was experiencing neck and myofascial pain. Nirren performed a trigger point injection and a right rhomboid injection.
 

 d. March 21,1991: Desai was suffering from myofascial pain. Nirren performed a trigger point injection and a right rhomboid injection, and he also provided a prescription for physical therapy.
 

 Records from Dr. Gropper
 

 On June 21, 1991, Dr. Gary R. Gropper (“Gropper”) was asked to provide a second opinion after Wells recommended possible fusion surgery. Gropper instead recommended joint injections, neck immobilization, or a different non-steroidal anti-inflammatory.
 

 Records from Dr. Raj
 

 Dr. P. Prithvi Raj (“Raj”), a physician with the National Pain Institute, treated Desai from 1992 to 1993. Raj’s particular findings from each visit are summarized below.
 

 a. September 4, 1992: Raj diagnosed Desai with occipital neuralgia and performed a nerve block.
 

 b. September 8,1992: Desai called and indicated she was somewhat sore from the
 
 *1296
 
 nerve block and trigger point injections, but that her pain had improved.
 

 c. September 18, 1992: Raj noted that Desai was “doing great” since her last nerve block.
 

 d. September 23, 1992: Desai was complaining of sharp pain associated with turning her neck, and Raj noted tenderness to palpation in the facet area, approximately at the C6 level. Raj diagnosed Desai with facet joint irritation and determined that Desai should return on September 24,1992 for massage therapy.
 

 e. September 25, 1992: Desai called and indicated she felt better since the massage therapy was administered.
 

 f. October 16, 1992: Raj noted that he had spoken with Desai and that she had improved since the massage.
 

 Records from Dr. Burton
 

 Dr. Robert J. Burton (“Burton”), a physician employed by the North Georgia Pain Clinic, treated Desai from 1993 to 1994. Burton's specific findings from each visit are summarized below.
 

 a. February 26, 1993: Desai was tender in the facet area, and Burton noted there was tenderness to palpation in the cervical portion of the trapezius muscle. Burton determined that Desai was suffering from facet joint irritation and myofas-cial pain and prescribed the administration of a nerve block.
 

 b. May 13, 1993: Desai was experiencing chronic tension headaches, perhaps induced by stress at work, as Burton indicated. Burton administered a trigger point injection and H-wave and noted that Desai described the beginning of relief with these injections.
 

 c. May 7, 1993: Burton performed a nerve block/trigger point injection.
 

 d. August 3, 1993: Burton performed a trigger point injection.
 

 e. April 29,1994: Desai was experiencing tenderness to palpation of the right occiput and upper trapezius. Burton recommended nerve blocks, trigger point injections, as well as Soma and a nonsteroi-dal anti-inflammatory.
 

 f. May 19, 1994: Desai was experiencing pain to palpation noted in the right occiput and midtrapezius. Burton administered a nerve' block and trigger point injection.
 

 g. May 26, 1994: Burton administered a nerve block and recommended a continuation of Soma and nonsteroidal and anti-inflammatories.
 

 h. July 28, 1994: Burton administered a nerve block.
 

 i. September 22, 1994: Burton administered a nerve block and C2 injection and then recommended Soma and nonsteroidal anti-inflammatories.
 

 j. September 29, 1994: Desai was experiencing continuing pain in occipital distribution and administered a nerve block. Burton recommended medication and continued nerve blocks.
 

 Records from Dr. Lippitt
 

 Dr. Alan Lippitt (“Lippitt”), a physician at Orthopedic Medicine & Surgery, treated Desai from 1994 to 1996 and administered many facet joint injections. Lippitt’s particular findings from each visit are summarized below.
 

 a. October 17,1994: Lippitt performed an initial review of Desai, noting the various types of pain management administered in the past. Lippitt recommended prolotherapy, starting with a cervical facet block.
 

 b. November 30, 1994: Lippitt performed a facet joint injection.
 

 
 *1297
 
 c. December 13, 1994: Desai was provided complete relief by the cervical facet joint injection.
 

 d. February 8, 1995: Desai" was pleased with the results of the cervical facet joint injections but was beginning to experience headaches again. Lippitt indicated that he would proceed with proloth-erapy.
 

 e. February 17, 1995: Desai reported being pain- and headache-free.
 

 f. March 3, 1995: Desai’s headaches had recurred. Lippitt performed a facet injection and recommended controlling the pain with non-steroidals.
 

 g. March 29, 1995: Lippitt performed a facet joint injection.
 

 h. June 21, 1995: Lippitt performed a facet joint injection.
 

 i. July 7,1995: Desai was experiencing increasing neck pain, tingling and numbness over the entire right side of her body, and Lippitt requested that Desai go to the emergency room, where doctors informed her there was no immediate cause for alarm. Lippitt speculated that the somatic dysfunction may have been more symptomatic due to an upper respiratory infection.
 

 j. July 21, 1995: Lippitt noted that the cervical MRI was negative, but he noted that the MRI does not show bone well, and therefore the facet fracture and arthritis would not show up on the MRI.
 

 k. September 20, 1995: Desai had experienced three months of pain relief with the last injection. Lippitt performed additional facet block injections.
 

 l. October 11, 1995: Lippitt performed prolotherapy.
 

 m. October 25, 1995: Desai was doing “extremely well.”
 

 n. December 6, 1995: Desai was better but concerned her pain was returning. Lippitt performed prolotherapy again.
 

 o. December 27, 1995: Lippitt performed a right 3-4 cervical facet block and a block of the C3 ramus.
 

 p. January 5, 1996: Desai did not tolerate the C3 block well and was experiencing headaches and neck pain. Numbness in the right upper, extremity had subsided. Lippitt prescribed a Medrol dospak, Pepcid AC, Soma, and reevaluation.
 

 q. February 2, ■ 1996: Lippitt noted that the C3 block treated the reticular type pain from the right upper extremity into the fingers, but that Desai was continuing to experience neck pain described as joint pain. Lippitt administered a block on the C2-C3 and C3-C4 right cervical facets with a Lidocaine/steroid combination.
 

 r. March 26, 1996: Lippitt recorded that the last injection did not provide relief, so he performed another injection.
 

 s. May 13, 1996: Desai came in accompanied by her father and expressed that she was seriously considering surgery due to her pain.
 

 t. May 22, 1996: Lippitt administered another injection.
 

 u. July ,17, 1996: Lippitt administered another injection and recommended postponing surgery as long as Desai was getting relief between injections.
 

 v. August 9, 1996: Lippitt noted that the injection irritated the ulnar aspect of her upper extremity. Lippitt administered another injection and provided a prescription for Daypro. He attempted to administer a midline interspinous ligament injection but irritated a nerve and was unable to complete the process.
 

 
 *1298
 
 w. August 12, 1996: Desai had been experiencing a fair amount of pain since the injection and a “weird feeling” radiating in the right paracervical around the chin area. Lippitt provided some Darvo-cet for pain and recommended a couple of days of rest at home.
 

 Records from Dr. Baumann
 

 Dr. Patricia Baumann (“Baumann”), a physician at The Emory Clinic, treated Desai from 1996 to 1998. At each visit, when Baumann observed Desai’s level of alertness, Baumann found Desai oriented and not exhibiting signs of cognitive deficit. Baumann’s particular findings from each visit are summarized below.
 

 a. August 29, 1996: Baumann performed an initial evaluation on Desai, who was experiencing neck pain radiating into her arm and fingers and also creating numbness.
 

 b. September 5, 1996: Desai was suffering from neck pain and myofascial pain, so Baumann administered an epidural steroid injection. Baumann recommended the medications Lortab, Soma, and Relafen.
 

 c. September 19, 1996: Baumann then administered an epidural steroid injection and recommended the continuation of Lor-tab and Relafen for Desai’s treatment.
 

 d. October 3, 1996: Desai was experiencing neck pain and myofascial pain. Baumann administered an epidural steroid injection and recommended that Desai continue with Lortab and Relafen, seek physical therapy, follow-up with another doctor for biofeedback, and return for a follow-up visit in one month.
 

 e. October 31, 1996: Desai was suffering from neck pain and myofascial pain. Baumann discussed various medications with Desai and recommended that she see another doctor for biofeedback and other relaxation therapies for pain.
 

 f. April 17, 1997: Desai was suffering from neck pain and myofascial pain but had found some relief through physical therapy. Baumann recommended continuing on Lortab.
 

 g. April 22, 1997: An epidural steroid injection was administered and Desai was told to remain on Lortab.
 

 h. May 20, 1997: Desai was experiencing neck pain and myofascial pain. Bau-mann administered an epidural steroid injection and recommended a continuation of Lortab.
 

 i. September 16, 1997: Desai was exhibiting mild pain behaviors and multiple trigger points. Trigger point injections were administered.
 

 j. October 1,1997: Desai was suffering from neck pain and myofascial pain. Bau-mann administered an epidural steroid injection.
 

 k. October 15, 1997: Desai was suffering from neck pain and myofascial pain. Baumann administered an epidural steroid injection.
 

 l. March 4, 1998: Desai was suffering from neck pain and myofascial pain. Bau-mann administered an epidural steroid injection.
 

 m. March 11, 1998: Desai was suffering from neck pain and myofascial pain. An epidural steroid injection was administered. Baumann recommended a continuation of medications.
 

 n. March 18, 1998: Desai was experiencing neck pain and myofascial pain. Baumann then administered an epidural steroid injection, recommended that Desai continue prescribed medications, and seek follow-up care as necessary.
 

 o. July 16, 1998: Desai was experiencing neck pain, myofascial pain, and possible C2 neuropathy. Baumann rec
 
 *1299
 
 ommended acupuncture, Nerontin and Baclofen, as well as the continuation of Lortab.
 

 р. October 9, 1998: Baumann signed a Physician’s Report of Disability, stating that Desai had suffered a fracture to her vertebrae and that she was presently disabled. Baumann , also recorded that the date on which patient should be able to return to work cannot be determined.
 

 Records from Dr. Greenfield
 

 Dr. Greenfield (“Greenfield”), a physician with Harper
 
 &
 
 Morris Orthopedic, treated Desai in 1998 and assessed her level of disability. Greenfield’s particular findings are summarized below.
 

 a. September 23, 1998: Desai reported with “constant stabbing and burning pain,” radiating from the right side of the base of the neck and head and into the shoulder, arm, and occasionally the thigh. Radio-graphs revealed a fracture and segmental instability at C2-C3. The assessment stated that Desai was suffering from cervical myofascial pain syndrome, the pain from which will likely persist indefinitely.
 

 b. November 4, 1998: Desai reported she was “doing a little bit better.” She complained that a functional capacity assessment had exacerbated symptoms, which were resolved after trigger point injections.
 

 с. February 10, 1999: Desai reported she was “doing well,” and that her symptoms were tolerable. She reported that she was undergoing acupuncture. The doctor noted Desai was neurologically stable but had some tender trigger points “about the base of the neck and parascapu-lar regions.” Overall, it was noted Desai was “doing well” and that she would continue to receive acupuncture treatments and follow-up at Harper & Morris when the treatments became ineffective. On this date, Greenfield completed Fortis’ Attending Physician’s Initial ■ Statement of Disability, noting that Desai suffered from a Class 4 Physical Impairment, described as a “moderate limitation; capable of sedentary, clerical - or administrative work-occasional 10# of force, mostly - sitting.” Greenfield described Desai’s ,.condition as “permanent,” noted that she was not reasonably expected to achieve full or partial recovery, and that she had reached the maximum medical improvement level. Finally, Greenfield noted that job modification, such as working within limits and adjusting seat height, would enable Desai to work with impairment.
 

 d.Affidavit: Greenfield testified “it was appropriate for [him] to recommend disability from the claimant’s job due to her diagnosis and reported symptoms.” Greenfield further stated that Desai “has a medical condition/diagnosis which’ could produce' the symptoms she alleges including, but not limited to, moderate to severe pain, the need to lie down periodically for pain relief, difficulty sitting for prolonged periods of time, etc.” Additionally, Greenfield -noted “the prescription of narcotic pain medications on a long term basis for management of [Desai’s] condition is entirely reasonable and consistent with her diagnosis and treatment .... ” Greenfield also stated that Desai was attempting to manage her condition “conservatively without surgical intervention,” which did not mean that she was not an appropriate candidate for surgery.
 

 Records from Dr. Cook
 

 On October 14, 1988, Dr. Stephen S. Cook (“Cook”), an orthopedic surgeon, stated that an MRI showed Desai had mild posterior ridging of C2 and some anterior lipping of C2 with some degeneration of the disc, all of which, are consistent with a Type II hangman’s fracture with disruption to the C2-C3 disc space at the time of her original injury. -Cook reported no sign
 
 *1300
 
 of instability, but remarked that the MRI showed the growth of an osteophyte
 
 [22]
 
 bridging the joint space anteriorly. Cook stated there is little to do other than symptomatic support, noting that Desai was not interested in surgery at that time.
 

 Records from Dr. Cone
 

 Dr. L. Anita Cone (“Cone”), a physician employed by Georgia Pain Physicians, Inc., treated Desai from 1998 to 2000. At each visit, Cone found Desai to be alert and oriented. Cone’s particular findings from each visit are summarized below in chronological order.
 

 a. September 30, 1998: Desai reported pain, headaches, and insomnia. Cone recommended nerve blocks and nerve radiof-requency denervation, possible acupuncture, visits with another doctor, and followup visits.
 

 b. October 27, 1998: Desai reported constant pain that was preventing her from sleeping. Cone recorded positive pain on palpatory exam in the upper and middle trapezius with several tender points. Cone scheduled further testing, a nerve block, chemodenervation of the cervical region, and prescriptions for Soma and Lortab.
 

 c. January 8, 1999: Cone recorded the existence of less tenderness to palpation over the bilateral cervical paraspinals and upper trapezius compared to the previous exam but noted some tenderness to palpation over the mid and lower facets. Cone recommended home exercise, acupuncture, aquatic exercise, and a continuation of Soma and Lortab.
 

 d. September 10, 1999: Cone recorded the existence of right-sided neck pain with rotation and side bending, as well as tenderness with palpation over the right sided facet joints. Cone recommended a trial of Celebrex, an increase in home exercise, aquatic exercise, Pilates, acupuncture, a refill of medications, and a follow-up visit in six months or sooner if necessary.
 

 e. February 22, 2000: Desai was experiencing right-sided neck pain and moderate tenderness in facet joints. Additionally, Cone recorded that there were multiple trigger points on the myofascial exam associated with muscle spasm in the right cervical paraspinal regions. Cone recommended massage therapy, aquatic exercise, Pilates, acupuncture, and a discontinuation of prescription medication due to pregnancy.
 

 f. Deposition Testimony: Cone described Desai’s injuries as “a hangman’s fracture with C2-3 instability ... facet joint dysfunction because that happens especially with a fracture of that sort and myofascial pain, which is the muscles in the area in the neck going into spasm and becoming painful .... ” Cone also stated that someone with this diagnosis would probably experience neck pain, perhaps radiating into the neck and shoulders, headaches, and possibly neurological problems. Cone testified that Desai reported to her that her pain ranges between six and nine, on a zero to ten scale, with ten being the worst pain imaginable, and that her pain has worsened over time. Cone stated that Desai had had trigger point injections, surgical epidurals, nerve root blocking, facet join injections, acupuncture, and physical therapy to manage her condition. Cone noted that Desai reported that she has to lie down periodically throughout the day because of pain and fatigue, a condition Cone reported as reasonably consistent with her diagnosis of Desai. Cone further noted that the medications prescribed for Desai are associated with side effects, such as drowsiness or de
 
 *1301
 
 crease in cognition, even in low dosages. In regard to a suitable working environment for Desai, Cone opined that Desai would need to be able to lie down when her pain level was significant and that she would need to be able to sit, stand, and walk at will. When presented with Desai’s job description, Cone stated that she did not think Desai would be able to meet job expectations because of her pain level, the necessity of frequently changing positions, and her diminished ability to concentrate or handle stress. Finally, Cone testified that Desai’s ability to conceive was not at all an indicator that she was not disabled.
 
 [23]
 

 Records from Mr. Cantu
 

 On August 4, 1998, Mr. Robert Cantu (“Cantu”), the clinic director of Physiotherapy Associates, reported that his Special Needs Assessment of Desai, performed to determine if she was able to do her job as an MIS, indicated that Desai “would have significant difficulty performing her job, especially as it is now evolving.”
 

 Based on a Functional Capacity Evaluation, Cantu recommended that Desai was capable of a Light physical demand level, but that she should avoid continuous sitting or standing, only engaging in those activities frequently, which is defined as between thirty-four to sixty-six percent of the workday. Cantu noted that Desai had decreased flexion of the neck, experienced mild shoulder weakness, and verbalized and appeared to be in significant discomfort through the examination. Cantu indicated that Desai appeared to put forth maximum effort on all evaluation tasks, thus making it likely the documented capacities of the report are accurate.
 

 Vocational Evaluation Records from Carol Cox Pursley, PhD.
 

 On March 2, 2000, Dr. Carol Cox Purs-ley (“Pursley”), a board certified forensic examiner, licensed professional counselor, and licensed psychologist with North Fulton Psychological Services, Inc., administered the Wechsler Adult Intelligence Scale (Revised) (WAIS-R), the Clerical Abilities Battery (CAB), and a'comprehensive sleep questionnaire. Pursley reported that Desai appeared to put forth her best effort during the evaluation process.
 

 Desai requested ten-minute breaks after every forty-five to sixty minute time interval and took half of a Lortab to reduce neck pain after the first ninety minutes. Pursley noted that forty minutes later, Desai was “somewhat less articulate in verbal communication and notably slowed in her performance speed.” Desai was unable to tolerate the final minutes of a twenty-minute clerical task and frequently shook her right hand and arm during the third and fourth hour of the evaluation to combat progressive numbness.
 

 Pursley noted that Desai’s full scale I.Q. score placed her at the 45th percentile rank within the Average range of function. Her verbal I.Q. score placed her at the 61st percentile rank, but her performance I.Q. score placed her at the 29th percentile rank. Pursley determined that the twelve-point difference between verbal and performance I.Q. scores is statistically significant, “reflecting true impairment in performance beyond what would be anticipated in absence of organically-based factors such as pain and impaired visual perceptual functioning.” Pursley also noted that Desai’s full scale I.Q. contrasted with her history of “successfully completing several years of college coursework prior to successfully meeting the challenge of working within the fast-paced MIS arena.”
 

 Additionally, Pursley pointed out that Desai’s scoring on the WAIS-R subtest of
 
 *1302
 
 Picture Completion was significantly below age-related peers, and that
 

 [h]er diminished capacity to visually scan and accurately note absence of important details has obvious adverse impact on job performance in any clerically-based work setting. Despite her taking 10-minute breaks after approximately every 45 to 60 minutes of task performance, her concentration was diminished by pain, side effects from pain medications, and long-term (pain-related) non-restorative sleep.
 

 As to the CAB subtests, Desai’s scores in most categories were near average or above average, but her addition and subtraction subtest score was extremely poor, in contrast to her WAIS-R Arithmetic score, which was commensurate with age-related peers. As explanation, Pursley noted that by the time Desai took the addition and subtraction subtest of the CAB, she was “exhibiting overt pain behaviors and indeed ‘gave up’ just prior to completing the final 20 minutes of testing on Reasoning with Numbers having reached her limit in task performance.”
 

 Pursley discussed that Desai’s Comprehensive Sleep Questionnaire reflected chronic problems with non-restorative sleep due to neck pain. Pursley provided information related to her consultations with medical personnel responsible for treating Desai, but the court will not summarize this information here as the records from other treating personnel are summarized above or below.
 

 Finally, Pursley summarized her findings:
 

 [I]t is medically documented and observed during vocational testing that even attempting to undergo sedentary tasks of over 90 minutes in duration necessitated taking pain medication which clearly compromised [Desai’s] attention and concentration. Attention and concentration are also essential to meeting minimal standards of even semi-skilled occupations. As previously discussed at length, essential functions of MIS positions are extremely intense in their demands not only for intellectual acuity but for reliability, dependability and ability to sustain routine functions without interruption such as taking breaks and/or lying down. MIS positions are inherently stressful which is an additional factor in compromising attention/concentration. Elevations in pain severely compromise capacities for productive interpersonal communications especially under highly stressful conditions inherent to MIS work. After careful analysis, I find that for MIS duties, the variable circumstances inherent to these “crisis-based” MIS job positions do
 
 not
 
 permit the employee to lie down at will. I conclude that on the basis of my Vocational Evaluation, subsequent consultations with medical providers, and review of comprehensive medical records that [Desai] would be unable to sustain any type of employment even if sedentary in physical demands due
 
 to
 
 significant compromised intellectual function and very limited physical capacities.
 

 Acupuncture Bills from the Emory Clinic
 

 Acupuncture bills from the Emory Clinic indicate that Desai received acupuncture therapy twenty-seven times from August 1998 to February 2000.
 

 Pharmacy Records
 

 a. CVS/Revco Pharmacy # 5411: Records show that prescriptions for Hydroco-done, Prenatal Plus, Carisoprodol, Cele-brex, Ibuprofen, Tylenol with Codeine, Doxycychline, Methergine, Lariam, and Phenergan were filled for Desai between January 27, 1999 and February 14, 2000.
 

 
 *1303
 
 b. CVS/Revco Pharmacy # 4724: Records show that prescriptions for Guaifen, Ceftin, Hydrocodone, Guaifenesin, Carioso-prodol, Liquibid-D, Neurontin, Zyban, Diazepam, Doxycycline, Endocet, P-Ephed/CPM, Cefzil, Soma, Prenatal Plus, Metronidazole, Relafen, Daypro, Phener-gan, Promethazine, Claritin-D, and Cefac-lor were filled for Desai between January 1,1996 and March 3, 2000.
 

 c. CVS/Revco Pharmacy #4759: Records show that prescriptions for Alprazo-lam, Hydrocodone, Relafen, Amoxicillin, Guaifen/P-Prop, Provera, Soma, Zithro-max, and Flexeril were filled for Desai between January 1, 1993 and March 2, 2000.
 

 d. Big D Drugs: Records show that prescriptions for Soma, Methylpred, and Propo-N/APAP100-650 were filled for De-sai between November 6, 1995 and March 5,1996.
 

 Various Drug Descriptions
 

 The administrative record contained information regarding the side effects associated with two of Desai’s prescription medications, Soma and Hydrocodone. Side effects normally associated with Soma include stomach upset, heartburn, constipation, headache, dizziness, or drowsiness. Side effects generally associated with Hy-drocodone include constipation, lighthead-edness, dizziness, drowsiness, stomach upset, nausea, or flushing.
 

 Social Security Administration Records
 

 On June 15, 2000, the Social Security Administration deemed Desai totally disabled as of April 1, 1998, awarding her benefits.
 

 Testimonial from Coworker Jordan
 

 Cynthia A. Jordan (“Jordan”), one of Desai’s coworkers, was aware of Desai’s condition. Jordan stated that, as a result of the pain and medications, she would see Desai “deteriorate in her ability to function,” particularly between pain management procedures. She noted, “Eileen experienced some pain on a daily basis, but as time went on, the point where she would begin to experience incapacitating pain became shorter and shorter.” Jordan described Desai’s job as one that required a variety of mental and physical skills. She explained that coworkers would assist with physical tasks such as lifting because performing them would worsen her pain. Jordan noted, however, that Desai often had to crawl on the floor to check computer and phone connections and had to use the telephone and computer extensively, all of which would exacerbate her pain. Finally, Jordan noted that Desai’s medications affected her ability to concentrate at work.
 

 Surveillance Records
 

 Fortis conducted surveillance of Desai to determine if her daily activities would fail to support a finding of disability, but the surveillance reports show no such evidence.
 

 Records Generally Favorable to Fortis
 

 The administrative record contains reviews conducted by independent reviewers hired by Fortis as well' as Fortis employees. Below, the court’s summaries of the independent reviewers’ reports are presented first, followed by the summaries of the Fortis employees’ reports.
 

 Review by Dr. Hendler
 

 On May 12, 1999, Dr. Steven L. Hendler (“Hendler”), an independent medical reviewer, evaluated Desai’s medical records. He noted that a Type II hangman’s fracture, such as the one suffered by Desai, is generally considered unstable. After reviewing Desai’s records, Hendler stated:
 

 The objective findings do not support a limitation for lifting of 10 pounds. There are no objective findings reviewed
 
 *1304
 
 that indicate a reason to preclude light work involving occasional lifting up to 20 pounds and frequent lifting up to 10 pounds. She would require at will position changes. It is not clear that she could not perform at a medium level as well.
 

 On April 30, 2000, Hendler submitted a second review of Desai’s medical records and concluded that whether Desai was precluded from performing the material duties of her occupation could not be determined without further information. He recommended an independent medical examination and an independent neuropsy-chological examination.
 

 Review by Dr. Porter
 

 Dr. Robert C. Porter (“Porter”) of the Network Medical Review (“NMR”) reviewed Desai’s records for Fortis and provided a summary of his findings on May 31, 2000. Initially, Porter noted that De-sai’s records document the .diagnosis of a hangman’s fracture at C2-C3. Porter stated that narcotic medication, such as that taken by Desai, is inappropriate for someone suffering from chronic pain. Porter also noted that numerous physical examinations do not document motor or sensory abnormalities, neurological compromise,, motor strength loss, atrophy, or sensory deficit. Porter concluded that physical examinations and testing do not support a finding that Desai was unable to work. Porter further noted that the body usually adjusts with tolerances to narcotics after prolonged periods of use, and the cognitive impairments observed by Pursley are inconsistent with this.
 

 Review by Neulicht
 

 Dr. Ann Neulicht (“Neulicht”), a Rehabilitation Consultant, reviewed Desai’s records and provided a summary of those findings to Fortis dated June 12, 2000. Neulicht noted that Baumann’s records do not show that Desai’s pain was more severe in 1997-1998 than it was previously. She also stated that the first medical documentation of any functional restriction is the abbreviated Functional Capacity Evaluation/Special Needs " Assessment form dated August 1998, which documented that Desai was having difficulty with her job as it was “currently evolving, not as the job is generally performed.” Neulicht noted that job modification had been necessary and accommodated since 1985. Next, Neulicht commented that restrictions about whether and when Desai could sit, stand or lie down, as well as whether Desai was experiencing attention deficits were not delineated until Cone was deposed in February 2000. Furthermore, Cone did not list a starting date for the restrictions and did not evaluate Desai until September 1998. Neulicht admitted that the medications taken by Desai can cause various side effects, but she noted that individuals adapt to medicines when taken for chronic conditions and discussed that Baumann and Cone had indicated Desai was alert and oriented during her visits with them. Finally, Neulicht reviewed Pursley’s report and indicated that it is not a helpful assessment because of various methodological problems. Neulicht recommended a complete psychological evaluation.
 

 Review by Nick DeFilippis, Ph.D.
 

 On June 5, 2000, Dr. Nick DeFilippis (“DeFilippis”), a member of the American Board of Professional Neuropsychology and the American Board of Professional Psychology, provided a summary of his review of Desai’s medical records.
 
 [24]
 
 DeFi-lippis’ review mainly consisted of a critique
 
 *1305
 
 of Pursley’s report. Specifically, DeFilip-pis stated that Pursley used the old edition of the Wechsler Intelligence Scale and remarked that Pursley’s statement that the difference between the Performance and Verbal IQs is beyond what would be anticipated in the absence of organically-based factors such as pain and impaired visual perceptual functioning is false. DeFilippis noted that Pursley looked at the wrong set of scaled scores and did not examine the numbers accurately. Additionally, DeFi-lippis questioned why Pursley emphasized that Desai’s performance on one test showed she was negatively influenced by medication when she was taking medication at various times during the testing, and he also stated that Pursley did not take an adequate history of Desai. Finally, DeFilippis recommended an assessment of Desai that would address such issues as psychosomatic problems and other non-medical difficulties that may be contributing to her condition.
 

 Review by Dr. Turner
 

 Dr. Barry D. Turner (“Turner”), a board certified orthopedic surgeon and a medical director for Fortis, noted that Hendler had performed a full file review in May 1999 and concluded there were no objective findings to indicate a reason to preclude light work. The review further noted that Greenfield’s February 10, 1999 notes indicated that Desai was doing well at the time, that her current symptoms were tolerable, and that she did not need further surgery. Turner also stated that “there appears to be inconsistency between the level of pain [Desai] reports, and [her] ability to conceive.” Consequently, Turner opined that Desai should not require the use of potent narcotic medications, which affect her mental status. Turner recommended that Desai return to her sedentary occupation.
 

 In May 2000, Turner conducted a subsequent review, in which he questioned how Desai could be suffering from narcotic ov-ersedation, yet perform well on the Functional Capacity Evaluation and appear alert and oriented to her treating physicians. Turner concluded by stating that Desai should be able to work in her own occupation as a computer operations manager.
 

 Review by Hubbard
 

 Rich Hubbard (“Hubbard”), a certified rehabilitation counselor and certified disability management specialist employed by Fortis, reviewed Pursley’s report and recorded his findings in a memorandum dated April 3, 2000. In it, he noted that the WAIS-R test had undergone a revision and that there exists a more updated test, the WAIS-III. Additionally, Hubbard noted that the Performance subtests “raised some questions,” for example, that perhaps the low scores were a result of lack of visual acuity. Hubbard suggested that it was unclear why Desai would score so low on the CAB while demonstrating average arithmetic reasoning ability on the WAIS-R. He admitted, however, that he was not familiar with the CAB and guarded in questioning the value of administering it. Further, Hubbard suggested it may be helpful to review Desai’s college transcripts
 
 [25]
 
 to determine if her academic grades indicated the same level of intelligence as determined by Pursley. Finally, Hubbard stated, “I question whether the psychological testing presented has reasonably demonstrated that [Desai’s] cognitive ability is sufficiently impaired to function as
 
 *1306
 
 a Manager of Computer Operations, due to pain, medication, fatigue, etc.”
 
 [26]
 

 Review by Dr. Neubauer
 

 Dr. Patricia Neubauer (“Neubauer”), employed by Fortis in its Clinical and Psychological Services department, reviewed Neulicht’s findings. In a memorandum dated April 28, 2000, Neubauer summarized her observations. She noted that although Neulicht determined Pursley has the credentials to address the relevant vocational issues, the testing administered by Pursley was, in Neulicht’s view, insufficient to address the claimant’s cognitive abilities. Neubauer recommended that Desai attend a neuropsychological examination to evaluate if there is any psychological overlay to her pain complaints and to address cognitive ability.
 

 Court’s Own Findings
 

 Based on the court’s
 
 de novo
 
 review of the medical record before Fortis, which consisted of evidence favorable to Desai and evidence favorable to Fortis, the court concludes that Fortis’ decision that Desai was not disabled was wrong. As noted above, Desai needed to satisfy the following definition, of disability, as outlined in the Plan’s Operation Test, which states:
 

 during the first 30 months of a period of disability (including the qualifying period), an injury, or sickness, or pregnancy requires that you be under the regular care and attendance of a doctor,. and prevents you from performing at least one of the material duties of your regular occupation. . •
 

 Fortis does not dispute that Desai was under the regular care and attendance of a doctor, but disputes only that Desai was prevented from performing at least one of the material duties of her occupation as an MIS.
 

 Physical Impairment
 

 The evidence clearly shows that Desai suffered a hangman’s fracture to her C2-C3 vertebrae in 1985. Desai has based her disability claim on physical and cognitive disabilities associated with this injury. First, the court will address whether Desai had a physical impairment that prevents her from performing at least one of the material duties of her regular occupation as MIS.
 

 The court notes that each doctor who performed an in-person evaluation of Desai determined she was suffering pain associated with the fracture. The court recognizes that the Supreme Court has stated the opinions of treating physicians do pot deserve “special weight” in ERISA benefits decisions.
 
 See Black & Decker Disability Plan v. Nord,
 
 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). The Court also recognized, however, that “it may be true that treating physicians, as a rule, ‘ha[ve] a greater opportunity to know and observe the patient as an individual.’ ”
 
 Id.
 
 at 832, 123 S.Ct. 1965. Drs. Cone, Baumann, Lippitt, Greenfield, Burton, Raj, Wells, Gropper, Nirren, and Skoczylas, recorded that Desai was suffering from pain and treated her with various pain management techniques. Some doctors recorded specific remarks describing Desai’s pain: Cone recorded that Desai
 
 *1307
 
 stated her pain ranged from six to nine on a scale of one to ten, with ten being “the worst pain imaginable,” and Greenfield .indicated that Desai’s pain will persist indefinitely. Years ago, Skoczylas noted that he believed Desai’s injuries to be “permanent in nature” and that she would suffer from “recurrent episodes of discomforts.” Because of the pain she has continuously suffered, Desai has sought myriad types of pain management, ranging from massage therapy to acupuncture to invasive epidural injections, nerve blocks, and trigger point injections.
 

 Although the court sympathizes with Desai for having to deal with years of pain, the court also realizes that the fact that Desai has suffered from severe pain is not dispositive of whether she was also disabled. But the court does not have to speculate as to whether Desai was disabled. Her treating physicians have answered the question affirmatively. On October 9,1998, Baumann described Desai as presently disabled, and, on February 10, 1999, Greenfield stated that Desai suffers from a permanent disability. The court notes that Greenfield also indicated on a form that Desai was “capable of sedentary, clerical or administrative work” and that job modifications such as adjusting seat height would enable Desai to work with impairment, but, based on his affidavit, it appears to the court that Greenfield intended to convey that Desai was disabled because he stated that “it was appropriate for [him] to recommend disability from the claimant’s job due to her diagnosis and reported symptoms.”
 

 In addition to the medical evidence that shows Desai suffered from a physical impairment that was, as described by two of her treating physicians, .disabling, a Functional Capacity Evaluation and a testimonial provide further support for Desai’s disability claim. Objective functional capacity testing performed by Cantu shows that Desai was incapable of continuous sitting, and a testimonial in the record from one of Desai’s coworkers, Jordan, discusses that Desai’s job required her to crawl on the floor to check computer and phone connections. It is clear to the court that Desai, her treating physicians, a functional capacity evaluator, and even her coworker realized that her physical impairments prevented her from working in her regular occupation as an MIS.
 

 The court also notes that Desai was deemed disabled by the Social Security Administration. The court recognizes that an award of Social Security benefits is not dispositive of whether an individual is disabled.
 
 Paramare v. Delta Air Lines,
 
 129 F.3d 1446, 1452 (11th Cir.1997). Nonetheless, the Social Security Administration’s decision weighs in favor of a finding that Desai was, in fact, disabled.
 

 Fortis responds by noting that Desai’s alleged need to lie down during the day was accommodated by Alumax, pointing out that from April 1998 to July 1998, she was permitted to work from home and that she had been allowed medical leave as necessary in the years preceding. The court finds this argument unconvincing for two reasons. First, the Plan’s disability definition requires that Desai not be able to perform one of the material duties of her
 
 regular
 
 occupation. It does not require that she be unable to perform one of the material duties of her occupation as altered by her employer. Second, there is no proof in the record that Alumax would allow Desai to continue working from home, especially considering that Desai’s job consisted of being able to perform tasks that required her presence on-site, such as checking computer and telephone connections. Desai indicates she had not been working on a full-time basis since beginning working from home, but that
 
 *1308
 
 she had been assisting with projects “as possible.”
 

 In any event, the court finds Fortis’ own statements discount its present reliance on the fact that Alumax accommodated Desai. In its initial denial of Desai’s LTD claim, Rickmers, Fortis’ Supervising Team Leader for Disability Claims Management, wrote,
 

 It is important to note that an individuals [sic] regular occupation is not his or her own job with a specific employer or in a particular work environment. In evaluating an individual’s eligibility for benefits, we must evaluate that individual’s inability to perform his or her occupation as it is performed in a typical work setting for any employer in the general economy.
 

 Again, in its letter denying Desai’s first appeal, Deb McGlaughlin (“McGlaughlin”), an employee in Fortis’ Disability Claims Management department, wrote,
 

 Please note that your policy insures your occupation as a[sic] MIS manager, not your job with Alumax. The
 
 material duties
 
 noted above means the sets of tasks or skills required generally by employers from those engaged in a particular occupation. It does not include any idiosyncracies an employer may add to the position.
 

 If Fortis was measuring disability based on what the typical work setting would be, the court cannot find that Alumax’s accommodations, if they in fact were meaningful alterations that would have been maintained, would be relevant to what would occur in the general economy in the absence of proof that many companies would have allowed Desai to work from home as an MIS on a regular basis.
 

 Fortis has not solely relied on its accommodation argument. It has also presented evidence from Neulicht, Porter, Turner, and Hendler related to Desai’s physical impairment. According to Neu-licht, Desai only presented evidence that she was having difficulty with her job as it was currently evolving, not as the job was generally performed. The court finds that Neulicht misquoted Cantu’s opinion, which actually stated that Desai “would have significant difficulty performing her job, especially as it is now evolving.” The court interprets Cantu’s opinion to mean that Desai would have significant difficulty performing her job and that she would have increased difficulty performing it if it continued to evolve. Neulicht also asserted that Baumann’s records to do not show that Desai’s pain became more severe in 1997 and 1998 than it was previously. The court recognizes that Baumann’s records do not explicitly state that Desai’s pain was worsening, but Baumann noted that Desai received three epidural injections in a two-week period in March 1998. The court finds that such an invasive pain management method was most likely delivered because of increased pain Desai was experiencing and finds Baumann’s conclusory statement unconvincing. Finally, Neulicht notes that not until 2000, when Cone was deposed, were the restrictions on Desai’s ability to sit, stand,' or lie down delineated. The court notes, however, that Cantu stated that Desai could not sit continuously and Pursley discussed De-sai’s need to he down during the day. Although Cantu and Pursley are vocational and not medical experts, they evaluated how Desai’s physical health affected her ability to perform various tasks, an inquiry directly relevant to an analysis of whether an individual is disabled.
 

 Fortis also relied on the report of Porter, who stated that physical examinations and testing do not support a finding that
 
 *1309
 
 Desai was unable to work. Porter seemingly ignored that Baumann and Greenfield, who had performed physical examinations on Desai, declared that Desai was disabled.
 

 Fortis offers Turner’s review, which also noted there were no objective findings to indicate a reason to preclude light work. When coupled with the physicians’ findings of pain during examinations and the disability determinations made by the physicians, it is difficult to see how Turner reached this conclusion. Turner also excerpted from Greenfield’s examination records that Desai was “doing well” and had “tolerable symptoms.” Turner ignored the fact that, on the same day, Greenfield noticed Desai had tender trigger points and completed a form declaring Desai disabled.
 

 Finally, Fortis offers Hendler’s opinion that there were no objective findings in Desai’s records precluding her from engaging in light or even medium level work. His subsequent review, however, could not reach such a conclusive decision; he recommended that Desai receive an independent medical examination to make a determination as to her level of impairment.
 

 Considering all the evidence in the administrative record, the court finds Desai presented adequate evidence showing the existence of a physical impairment disabling her from working as an MIS. Fortis’ evidence, much of which was generated by its own employees, contained misleading excerpts and vague speculations. Most importantly, Fortis ignored the overwhelming amount of evidence supporting that Desai was impaired. Consequently, the court finds that Fortis’ decision was wrong.
 

 Cognitive Impairment
 

 Desai also claims that she was disabled because her cognitive capacities were diminished by side effects associated with medication she was taking for pain related to her fracture. There is support in the record from Pursley for this assertion, but Fortis presents its own evidence calling into question Pursley’s methodology. Because the court has found the existence of a physical impairment, which has led the court to the further conclusion that Fortis’ decision to deny benefits was wrong, the court finds it unnecessary to perform the evaluation of whether Desai was disabled because she suffered from an additional impairment.
 
 [27]
 

 b. Discretion
 

 Because the court has determined For-tis’ decision as to disability was wrong, it must evaluate the remaining questions related to standard of review. As previously noted, Fortis had discretion, as outlined in the Plan itself.
 

 c. Reasonableness
 

 The court must next determine whether Fortis’ decision, even though wrong, was reasonable. To determine what is reasonable, the court finds guid-
 
 *1310
 
 anee from cases applying the arbitrary and capricious standard, which requires a reasonableness inquiry. A decision that is reasonable has a rational, good faith basis.
 
 See Cagle v, Bruner,
 
 112 F.3d 1510, 1518 (11th Cir.1997). Because the court has set forth summaries of the material evidence in the record above, it will not restate that evidence here, but will evaluate whether Fortis made a rational decision based on the evidence in the record. The court finds it was unreasonable for Fortis to base its decision almost wholly on the opinions of reviewers who had not treated De-sai or evaluated her in person, to distort the opinions of those who had evaluated Desai, and to ignore the weight of the evidence in the record. The court is unable to find that the information provided in reports generated by Fortis employees and independent reviewers who did not evaluate Desai firsthand, when compared with the evidence presented by Desai, provided a record on which to make a rational, good faith decision that Desai was not disabled. The court finds that Fortis’ decision was not only wrong but was also unreasonable.
 

 To provide the most extensive analysis possible, though, the court will assume that Fortis’ decision was reasonable and consider whether Fortis has met its burden of showing that it did not act in its own interest in denying Desai’s disability claim.
 

 d. Conflict of Interest
 

 Assuming the court had determined Fortis made a reasonable decision, the court would next evaluate whether Fortis operated under a conflict of interest, and if so whether it acted in its own self-interest in denying Desai’s disability claim. In
 
 Brown v. Blue Cross and Blue Shield of Alabama, Inc.,
 
 898 F.2d 1556, 1561-62 (11th Cir.1990), the Eleventh Circuit determined that where a company both administers and funds a plan, a conflict of interest arises. As in
 
 Broum,
 
 Fortis both funds the Plan and makes determinations of eligibility, and both Fortis and Desai agree that Fortis has a conflict of interest. When there is a conflict of interest for the administrator, the standard of review to be applied is heightened arbitrary and capricious,
 
 see Torres,
 
 346 F.3d at 1329, which requires that the administrator must show that the interpretation of the plan was not tainted by self-interest.
 
 Brown,
 
 898 F.2d at 1561—62. A wrong but reasonable decision is considered arbitrary and capricious if it “advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation
 
 [28]
 
 on the ground of its benefit to the class of all participants and fiduciaries.”
 
 Id.
 
 at 1566-67. In its Motion for Summary Judgment, Fortis gives little attention to meeting its burden of showing its decision to deny Desai’s LTD claim was not tainted by self-interest. In fact, Fortis shifts the burden to Desai, stating that
 

 there is no evidence that Fortis Benefits’ determination that plaintiff was not entitled to benefits was motivated by anything other than the full and fair review of the records that were provided to it.
 
 *1311
 
 Plaintiff can produce no evidence to demonstrate that Fortis Benefits acted improperly
 

 In its reply brief, Fortis provided but a shred of evidence in support of its contention that it had not acted in its self-interest, simply stating that Desai's accusation that Fortis made its decision because of financial incentive was "unsupported by the record" and adding that it had continued its investigation of Desai's claim beyond the 120th day of receipt of her second appeal, evincing Fortis' effort to provide a full and fair review of the claim. It is unclear to the court how Fortis' continued investigation disposes of the issue of whether it acted in its self-interest, especially considering that during this period it supplemented the record with evidence supporting a denial. The court finds, and the parties agree, that Fortis was operating under a conflict of interest. Fortis' burden to show it was not acting in its self-interest has not been satisfied.
 

 In sum, the court finds that Fortis' decision was wrong and unreasonable. Further, even if the decision had been reasonable, Fortis has not met its burden of showing it did not act in its self-interest. Desai was improperly denied disability benefits. Fortis is ORDERED to pay De-sai the LTD benefits due to her in the amount of $115,120.76
 
 [29]
 
 plus interest.
 

 C. Failure to Provide Documents
 

 In its Brief in Opposition to De-sai's Motion for Summary Judgment, For-tis states that any remedial relief, such as that requested for failure to provide documents, is unavailable to Desai because Fortis is not the Plan administrator. See 29 U.S.C. § 1132(c). Before evaluating the viability of Desai's further claims, the court must resolve the issue of whether Fortis is in fact the Plan administrator. Proof of who is the plan administrator may come from the plan documents or the factual circumstances surrounding the administration of the plan. See Rosen v. TRW Inc., 979 F.2d 191, 193 (11th Cir.1992). First, the court notes that in its Motion for Summary Judgment, Fortis referred to itself as "the decision maker" in its discussion of the applicable standard of review. Then, in its discussion of the appropriate scope of the administrative record, Fortis cites case law that states the scope should be determined by the facts known to the administrator. See Jett, 890 F.2d at 1140 (emphasis added). The court notes that Fortis is not explicitly listed as the "administrator" in the Plan documents provided to the court, but Fortis admits it is the decision-maker on all disability claims made under the Plan and curiously does not provide the court with information as to what entity does act as the Plan administrator. Considering all these facts, the court finds that Fortis acts as the Plan administrator, and therefore Desai's further claims against it are not barred.
 

 It is unclear to the court whether Desai brings a separate claim for failure to provide documents, or whether this assertion is raised only as it relates to the scope of the administrative record that the court
 
 *1312
 
 should have reviewed for purposes of determining whether there was a wrongful denial of disability benefits.
 
 [30]
 
 The court will evaluate the issue as a discrete claim. Federal regulations relevant to ERISA provide:
 

 (g) Review Procedure
 

 1) Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may:
 

 (i) Request a review upon written application to the plan;
 

 (ii) Review pertinent documents; and
 

 (iii) Submit issues and comments in writing.
 

 29 C.F.R. § 2560.503-1(g) (2000). Desai asserts that she submitted requests for pertinent documents related to her LTD claim, but that Fortis failed, to provide her with the requested documents. Specifically, Desai asserts that in order to provide a proper “full and fair review,” Fortis was obligated to: “(1) identify any and all information pertinent to Desai’s claim; (2) afford Desai an opportunity to contest whether the record is complete; and (3) afford Desai the option of submitting rebuttal evidence.” In support, Desai cites only to cases from other Circuit Courts of Appeals. The court’s reading of those cases does not offer the same delineated list of obligations for Fortis as urged upon the court by Desai. Accordingly, the court will evaluate whether Desai was provided a full and fair review. In reviewing the. record, the court found that Fortis regularly sent correspondence
 
 [31]
 
 to Desai and/or her counsel, explaining the status of her claim as well as requesting additional records Fortis needed for review. Desai contends, though, that Fortis refused to provide documents, records and other information to her, yet relied on the information to Desai’s detriment. The only documents specifically named by Desai are “the opinions of ‘paper reviewers’ Neubauer, DeFilippis, Porter, and Neulicht,” which were generated between the first and second appeal decisions, and a “copy of the Fortis Disability Claims Manual and other training/policy/procedural materials.” Fortis asserts that 29 C.F.R. § 2560.503-1(g) (2000) does not apply to documents considered during Desai’s second appeal. If applicable, Fortis asserts it would result in an endless cycle of new materials for consideration. A district court in California considered a similar argument by a plan administrator in
 
 Russo v. Hartford
 
 
 *1313
 

 Life and Accident Ins. Co.,
 
 2002 WL 32138296, *4 (S.D.Cal., Feb.5, 2002), which it rejected. The administrator argued that 29 C.F.R. § 2560.503-l(g)
 
 [32]
 
 treats an administrator’s decision on an initial claim for benefits and its decision on appeal differently.
 
 Id.
 
 The court’s reading of the relevant regulation did not result in the same conclusion. It stated that there is nothing in the regulation “to suggest ERISA limits a plan administrator’s duty to disclose pertinent documents to evidence received or developed before the initial benefit denial.” This court finds that the regulations simply state that a “full and fair review” provides the opportunity to “review pertinent documents.” Fortis’ refusal to provide the reports of the independent reviewers denied Desai access to information relevant to her claim after the initial denial, “thus denying [her] the opportunity to respond to this evidence before the decision on review was reached.”
 
 Id.
 
 at *5. In practical terms, Fortis’ failure to produce the requested information “served to close the appeal process” to Desai, while holding it open for Fortis.
 
 Id.
 
 Accordingly, the court finds Fortis’ failure to provide requested documents constitutes a violation of 29 C.F.R. § 2560.503-l(g) (2000).
 

 Desai has proposed two types of relief for Fortis’ failure to disclose — exclusion of the undisclosed documents from the administrative record and penalties. Because the court included the undisclosed reports in its
 
 de novo
 
 review and nevertheless found the decision to be wrong and unreasonable, the court finds it unnecessary to evaluate whether exclusion of these documents from the administrative record is proper.
 
 [33]
 
 The court will, however, consider Desai’s request that Fortis be fined pursuant to 29 U.S.C. § 1132(c)(1), which provides that an administrator
 

 who fails or refuses to comply with a request for any information which such administrator is required by this sub-chapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) ... within 30 days after such request may in the court’s discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.
 

 29 U.S.C. § 1132(c)(1).
 
 [34]
 
 Because the court understands Fortis’ difficult position of needing to evaluate the continuous flow of new evidence from Desai, the court cannot in good faith assess the highest
 
 *1314
 
 level of fine per violation, but because 29 U.S.C. § 1132(c)(1) provides that each violation "shall be treated as a separate violation," and there were numerous documents Fortis failed to provide to Desai, the court must assess a fine that accurately takes into account the court's acknowledgment that Fortis did not comply with regulations promulgated to ensure a full and fair review to all ERISA claimants. Accordingly, the court finds that a $100 per day fine for all of Fortis' separate violations, beginning on the first date one of the undisclosed reports was available, April 28, 2000)
 
 [35]
 
 and extending through the date of Fortis' final denial, June 29, 2000,
 
 [36]
 
 is an appropriate penalty. Fortis is ORDERED to pay a fine of $6,100.00 for its failure to disclose pertinent documents.
 

 P. Breach of Fiduciary Duty
 

 It is also unclear to the court whether Desai brings a separate claim for breach of fiduciary duty.
 
 [37]
 
 In the interest of thoroughness, the court will examine the issue as a separate claim. Desai asserts that Fortis, acting as a fiduciary
 
 [38]
 
 of the Plan, violated its fiduciary duties by failing to disclose pertinent documents. Title 29 U.S.C. § 1104(a)(1) obligates fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries." The Supreme Court has held that although no private right of action for breach of fiduciary duty is provided for under 29 U.S.C. § 1109(a), the catch-all provision of ERISA, see 29 U.S.C. § 1132(a)(3), does allow a private right of action for breach of fiduciary duty. See Varity Corp. v. Howe, 516 U.S. 489, 511-13, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); Hamilton, 244 F.3d at 826.
 

 Desai asserts that Fortis' failure to provide pertinent documents while adding its own independent reports to the administrative record is a breach of fiduciary duty. Failure to disclose rises to the level of a breach of fiduciary duty. See id. at 827. Because the court has determined that Fortis failed to meet the disclosure requirements as outlined by federal regulations, the court does not need to perform further analysis here. Because Fortis failed to provide pertinent documents, it breached a fiduciary duty. The court will not assess additional penalties against For-tis for its breach as it arises out of Fortis' failure to disclose, for which the court has assessed fines above.
 

 E. Interference with Other Employee Benefit Plans
 

 As with the previous two claims the court evaluated, the court is unclear
 
 *1315
 
 whether Desai brings a separate claim for interference with other employee benefit plans. Although it is listed in the Complaint, it is not discussed in Desai’s Motion for Summary Judgment, with the minor exception of a vague reference to it in the section entitled “Request for Relief,” where Desai requests that
 

 the [c]ourt order reinstatement of all benefits and other entitlements to which Ms. Desai would have continued to be eligible for or become eligible for by virtue of her status as a recipient of disability benefits under the Plan/policy including but not limited to health insurance, dental insurance, AD & D, life insurance, retirement and pension plans, and other benefits, or in the alternative, that the Court award restitution to Ms. Desai for the loss of these benefits.
 

 Desai has not provided detailed information related to these other employee benefit plans, but the court finds any benefits available under these other plans that would have been provided to Desai had she been given disability benefits should be reinstated. The court is unable to enter judgment without evidence from Desai as to what other benefits are due from Fortis. Desai is ORDERED to file a document delineating (1) benefits due under other employee benefit plans; (2) the specific value that Desai states should be awarded for each such benefit; and (3) a brief explanation of why. The document shall not exceed ten pages and shall be filed within twenty days of the date of this Order. Fortis may respond with its own brief not to exceed ten pages within the twenty days following the filing of Desai’s submission.
 

 In sum, Fortis wrongfully denied disability benefits to Desai, failed to provide pertinent documents to Desai, breached its fiduciary duty, and may have interfered with other benefits due to Desai. Accordingly, Desai’s Motion for Summary Judgment is GRANTED, and Fortis’ Motion for Summary Judgment is DENIED.
 

 III.
 
 Desai’s Motion to Seal and Joint Motion of Desai and Dr. Robert C. Porter and Network Medical Review to Treat as Confidential and Protected the Deposition of Porter and Documents Produced by Porter and NMR
 

 Desai has moved to seal documents from Porter and NMR in Appendix A of Plaintiffs Supplement in Support of Plaintiffs Motion for Summary Judgment. Relatedly, Desai,
 
 [39]
 
 Porter, and NMR have moved that Porter’s deposition and the documents produced by Porter and NMR be treated as confidential and protected. The Federal Rules of Civil Procedure provide that the court may issue a protective order so that “a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way.” Fed.R.Civ.P. 26(c)(7). In considering whether information is confidential and deserving of protection, the court must balance the interests of the public and the parties who request that the information be sealed. There is a common-law privilege of public access to inspect and copy judicial records.
 
 See Nixon v. Warner Communications, Inc.,
 
 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978);
 
 United States v. Rosenthal,
 
 763 F.2d 1291, 1292-93 (11th Cir.1985).
 

 Porter and NMR contend that the testimony and documents “contain confi
 
 *1316
 
 dential and proprietary information” but fail to note what specific information falls within this classification. The court has reviewed Porter’s deposition and the related documents provided by Porter and NMR and was unable to find information that may be protected pursuant to the Federal Rules of Civil Procedure. Accordingly, the motion is DENIED.
 

 IV.
 
 Desai’s Motion for Leave to File Reply Brief
 

 Desai has filed a motion for leave to file a reply brief to Fortis’ Response to Plaintiffs Supplement in Support of Plaintiffs Motion for Summary Judgment. Because the court finds that the parties have had the opportunity to fully brief the issues relevant to the court’s evaluations of the issues presented in this case, the court will not alter its August 9, 2004 Order, which stated that “[n]o reply briefs will be permitted.” The motion is therefore DENIED.
 

 V.
 
 Reese & Reese’s Motion to Withdraw as Attorney
 

 The law firm of Reese & Reese has moved to withdraw its representation of Porter. The motion is GRANTED.
 

 VI.
 
 Summary
 

 For the foregoing reasons, (a) Defendant’s Motion for Summary Judgment [Doc. No. 44] is DENIED; (b) Plaintiffs Motion for Summary Judgment [Doc. No. 46] is GRANTED; (c) Plaintiffs Motion to Seal [Doc. No. 69] is DENIED; (d) Joint Motion of Plaintiff and Dr. Robert C. Porter, MD and Network Medical Review (“NMR”) to Treat as Confidential and Protected (1) the Deposition of Robert C. Porter, MD, Owner of Network Medical Review and (2) the Documents Produced by Dr. Porter and Network Medical Review [Doc. No. 72] is DENIED; (e) Plaintiffs Motion for Leave to File Reply Brief [Doc. No. 74] is DENIED; and (f) Reese & Reese’s Motion to Withdraw as Attorney [Doc. No. 76] is GRANTED.
 

 Fortis is ORDERED to pay Desai disability benefits due in the amount of $115,120.76 plus interest. If a party disputes the amount of benefits owed, the court will consider briefs on the issue. The briefs shall not exceed ten pages and shall be filed within ten days of the date of this Order. Fortis is further ORDERED to pay $6,100.00 in fines for its failure to disclose.
 

 The court is unable to enter judgment without evidence from Desai as to what other benefits are due from Fortis under additional employee -benefit plans. Desai is ORDERED to file a document delineating benefits due under such plans within twenty days of the date of this Order. Fortis may respond within the twenty days following the filing of Desai’s submission. Each document filed shall not exceed ten pages.
 

 The court will consider the award of attorney’s fees to Desai separately. Desai is ORDERED to file a motion for attorney’s fees within twenty days of the date of this Order. Fortis is ORDERED to file a response to Desai’s motion within the twenty days after Desai’s motion is filed. The briefs on the issue of attorney’s fees, which should be concise and sufficiently detailed, are not to exceed fifteen pages.
 

 [2]
 

 . Where one of the parties has disputed a specific fact and pointed to evidence in the record supporting her/its version of the events, the court has viewed all evidence and factual inferences in the light most favorable to that party, as required on an opposing party's motion for summary judgment.
 
 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 

 [3]
 

 . Although the court notes that Plaintiff uses a hyphenated last name, Hamall-Desai, the court will refer to her as "Desai" because Plaintiff's pleadings refer to her only by the latter portion of her last name.
 

 [4]
 

 . A hangman’s fracture occurs where a fracture line passes through the neural arch of the axis, which is the second cervical vertebra.
 

 [5]
 

 .A facet is a small plane surface on a bone.
 

 [6]
 

 . Cervical is defined as pertaining to the neck,
 

 [7]
 

 . Myofascial is defined as pertaining to or involving the tissue surrounding and associated with muscle.
 

 [8]
 

 . Facet joint injections, epidural steroid injections, and nerve blocks are injections commonly administered to alleviate pain symptoms.
 

 [9]
 

 . Based on a letter Desai wrote to Charlie Nix ("Nix") of Alumax, Inc. ("Alumax”) dated July 28, 1998, it appears to the court that Desai was working on a limited basis because she noted she had been working "from home on various projects
 
 whenever possible."
 

 [10]
 

 . The Plan provides a different definition for disability after a 30-month period, but this definition is not at issue in this case. Additionally, the Plan provides that an individual who meets an earnings test may also be considered disabled, but that provision is not at issue in this case.
 

 [11]
 

 . The Plan states that "[i]f a disabled person receives benefits from other sources, [Fortis] may reduce the benefits payable under the policy.” Other sources include benefits such as those awarded under the Social Security Act.
 

 [12]
 

 . The short-term disability policy was not insured by Fortis.
 

 [13]
 

 . Desai signed her application for LTD benefits on February 10, 1999, the accompanying cover memo for the application is dated March 1, 1999, and the application is stamped as having been received by'Disability Claims on March 8, 1999.
 

 [14]
 

 . The court recognizes its obligation to construe disputed facts in favor of the nonmoving party, a task made more difficult when the parties have filed cross-motions for summary judgment. The merger that would result in the closing of Alumax's Buckhead office was announced on March 9, 1998, and Desai was notified her job would be phased out in April 1998. Fortis has not presented evidence, other than conclusoiy speculation, that Desai’s decision to bring a benefits claim arises from her knowledge that she would lose her job. On the other hand, Desai has presented evidence that her pain symptoms were increasing before she knew of the merger, which would not have been directly informative on the issue of whether her job was in jeopardy. The evidence before the court does not justify a finding that Desai asserted her claim for disability benefits because, she knew she would be losing her job.
 

 [15]
 

 . Here, Desai has claimed her' appeal was mailed in early August 1999 and has submitted a Federal Express receipt as evidence of this fact. Fortis does not dispute the appeal was sent but asserts that the intended recipient, Ron Rickmers ("Rickmers”) of Fortis, did not receive the appeal. The Federal Express receipt shows only that the appeal was signed for by M. Carpenter on August 6, 1999. As such, there appears to be no dispute about when the parties responsible for appeals review at Fortis received the appeal. Moreover, there is no evidence that Fortis deliberately ignored Desai’s appeal. That being the case, the court will assume Fortis did not receive Desai’s appeal until November 2, 1999.
 

 [16]
 

 . In the record, "neuropsychological” and "neuropsychiatric" are used interchangeably. The court will use the term "neuropsychological” for consistency.
 

 [17]
 

 . Before an employee may commence a legal action arising out of the denial of benefits under an ERISA plan, she must first exhaust whatever avenues of administrative redress exist under the plan.
 
 See Merritt v. Confederation Life Ins. Co.,
 
 881 F.2d 1034, 1034 (11th Cir.1989).
 

 [18]
 

 . The Eleventh Circuit has summarized the standards of review:
 

 De novo
 
 review ... offers the highest scrutiny (and the least judicial deference) to the administrator's decision. In fact, we accord
 
 no
 
 deference there, since, no judgment/discretion was exercised in making the determination
 
 (i.e.,
 
 there is no discretion to which we would defer).
 

 In contrast, where the administrator has discretion
 
 (i.e.,
 
 applies his own judgment) in making plan decisions, we review under the arbitrary and capricious- standard (which is substantively the same as the
 

 "abuse of discretion” standard). We use it to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny).
 

 Finally, where the administrator has discretion but' exercises it under a conflict of interest, we apply "heightened arbitrary and capricious” review. There we apply a level of deference (and conversely, scrutiny) somewhere between what is applied under the
 
 "de novo
 
 and "regular” arbitrary and capricious standards.
 

 Williams,
 
 373 F.3d at 1137 (internal citation omitted).
 

 [19]
 

 . The court notes that 29 C.F.R. § 2560.503-1 has been amended since 2000. The regulation as it existed in 2000 has been applied by the court.
 

 [20]
 

 . Although the records summarized here were not presented in chronological order in the administrative record filed with the court, the court has undertaken to present them in chronological order for clearer organization. Although the court has reviewed the entire administrative record, the court has summarized only the most pertinent records here, excluding some of the minor records in an attempt to remain somewhat concise in its discussion of the issues in this case.
 

 [21]
 

 . In December 1990, Dr. Walt Sheffield, an orthodontist, diagnosed Desai with jaw joint dysfunction.
 

 [22]
 

 . An osteophyte is a bony outgrowth.
 

 [23]
 

 . Cone commented on whether Desai's ability to conceive is related to her claim for disability in response to Dr. Turner’s statement, outlined below.
 

 [24]
 

 . DeFilippis was hired to perform the neu-ropsychological evaluation of Desai, but Desai did not report for the examination. DeFilip-pis instead provided a review of Desai’s medical records.
 

 [25]
 

 . The court notes that the administrative record before it contains Desai's academic transcript from West Georgia College. During her time there, she received twelve As, nine Bs, and two Cs, resulting in a 3.41 overall grade point average.
 

 [26]
 

 . Pursley wrote an Addendum to her report, dated April 18, 2000, in which she responded to Hubbard's critique of her review. In the Addendum, Pursley stated that Desai’s comprehensive Vocational Evaluation was not conducted for the purpose of establishing an intelligence quotient or I.Q., thus WAIS-R subtests were proper as they were a supplement to the more extensive and focused evaluation of a client’s most vocationally relevant capacities utilizing the CAB. Pursley further noted that lack of visual acuity had nothing to do with Desai’s results because her vision is not impaired.
 

 [27]
 

 . This conclusion also does away with the necessity that the court address the issue of whether Fortis could compel a neuropsycho-logical evaluation. Fortis asserts that based on explicit language in the Plan, it can force Desai to undergo a neuropsychological evaluation. It had previously requested that she be evaluated, but she did not show up, perhaps because her doctor informed her that it would not be in “her best interest” to undergo such testing during a high-risk pregnancy. Because the court has determined there is adequate evidence supporting the fact that De-sai's physical impairment makes her disabled, it will not inquire into the issues related to whether she is also cognitively impaired.
 

 [28]
 

 . The
 
 Torres
 
 court extended heightened arbitrary and capricious review to all determinations, both factual and interpretive. 346 F.3d at 1332. As such, it is appropriate to extend the
 
 Brown
 
 court's holding as related to conflict of interest to factual determinations made
 
 by
 
 a fiduciary operating under a conflict of interest.
 
 See Featherston v. Metro. Life Ins. Co.,
 
 223 F.R.D. 647, 652 (N.D.Fla.2004).
 

 [29]
 

 . The parties' pleadings do not, in the court's view, adequately inform the court as to the proper amount due under the Plan. The court has determined this amount from the following calculation: Desai's monthly salary of $5,755.75 x 66 b % = $3,837.36 x 30 months = $115,120.76. If either of the parties disputes this amount, the court is willing to consider briefs on the issue, which should be no more than ten pages and should be submitted no later than ten days following the date of this Order.
 

 [30]
 

 . In the Complaint, Desai appeared to state a separate claim for Fortis’ failure to disclose, but in Plaintiff’s Motion for Summary Judgment, Desai discusses Fortis’ failure to disclose only as it relates to what the court should review in the administrative record, requesting as relief that the court exclude the documents not properly disclosed. Additionally, however, Desai requests as relief that "the [cjourt order payment of a penalty from Defendant Fortis ... for failure to provide to Ms. Desai requested information required to be provided under ERISA ...To evaluate whether Fortis should be assessed penalties for failing to disclose, the court must engage in the relevant analysis.
 

 [31]
 

 . The administrative record includes letters from March 22, 1999, April 22, 1999, June 6, 1999, March 23, 2000, April 7, 2000, April 21, 2000, May 1, 2000, May 9, 2000, and June 29, 2000.
 

 [32]
 

 . The regulation considered by the
 
 Russo
 
 court was the same version applicable in the present case.
 

 [33]
 

 . Although it is of no consequence, the court notes it reviewed the authorities cited by De-sai for her proposal to exclude the withheld documents from being considered part of the administrative record and found them to be unsupportive of her position. As the authorities state and as the Eleventh Circuit has held in
 
 Jett,
 
 a court should resolve the issue of eligibility based on the information that was before the administrator. 890 F.2d at 1140. Here, in performing its review of Fortis’ decision, the court has not considered information other than what was before Fortis. Perhaps there could have been more information in the administrative record had Fortis allowed Desai to supplement the record with evidence to rebut the independent reviews, but it makes no practical difference because the court included those independent reports in its review and nonetheless found that For-tis had made a wrong and unreasonable decision.
 

 [34]
 

 .Title 29 C.F.R. § 2560.503-1 was promulgated by the Secretary of Labor pursuant to 29 U.S.C. § 1132.
 

 [35]
 

 . Neulicht's report was available on April 28, 2000. The court has determined it is unnecessary to provide Fortis a thirty-day grace period following the availability of Neulicht's report, as statutorily provided for, because Desai, through her counsel, had requested that all pertinent documents be provided to her on several occasions before the thirty-day period preceding April 28, 2000.
 

 [36]
 

 . Excluding both April 28, 2000 and June 29, 2000, the court has calculated that the penalties amount to $100.00 X 61 days, which totals $6,100.00.
 

 [37]
 

 . In the Complaint, Desai set forth a separate claim for breach of fiduciary duty, but in her Motion for Summary Judgment, she does not appear to list the claim as a separate count but instead discusses it as a reason to exclude documents from~ the administrative record. Desai also requests as relief that "the [c]ourt issue a declaration of Defendants' breach of their fiduciary duties under ERISA."
 

 [38]
 

 . ERISA defines a fiduciary with respect to the plan as someone who has any discretionary authority over the administration of the plan. See 29 U.S.C. § 1002(21)(A). A plan administrator, such as Fortis, is a fiduciary under ERISA. See Hamilton v. Allen-Bradley Co., Inc., 244 F.3d 819, 826 (11th Cir.2001).
 

 [39]
 

 . The motion states that Desai merely consents to the request for a protective order without taking a position on the confidential and proprietary nature of the documents as alleged by Porter.