### Theodore McDOWELL, Plaintiff,

v.

### STANDARD INSURANCE COMPANY, Defendant.

### Civil Action No. 1:07–CV–1103–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 20, 2008.

concludes the requirements of 28 U.S.C. § 1292(b) are met and no additional briefing is required.

Jeffrey S. Warncke, Dietrick Evans Scholz & Williams, Atlanta, GA, for Plaintiff.

Joelle C. Sharman, Smith Moore, LLP, Michael Andrew Coval, Ford & Harrison, Atlanta, GA, for Defendant.

**1363**

## ORDER

MARVIN H. SHOOB, Senior District Judge.

In this action, plaintiff is claiming long term disability benefits under a group disability policy governed by the Employees Retirement Income Security Act ("ERISA"). The relevant long term disability ("LTD") policy was issued and is administered by defendant Standard Insurance Company ("Standard"). Pursuant to the Court's scheduling Order of August 14, 2007, the parties have briefed the following issues:

1. Whether plaintiff's claim for benefits is barred for failure to exhaust administrative remedies;

2. If not, whether defendant afforded plaintiff a "full and fair review" of his claim;

3. If so, whether plaintiff's claim should be "deemed denied";

4. If so, under what standard should defendant's benefits be judicially reviewed; and

5. If the benefits determination is reviewed under the heightened arbitrary and capricious standard, whether the "administrative record" includes expert reports produced after plaintiff filed the instant suit.

On April 17, 2008, the parties filed a joint motion requesting the Court to rule on the preceding issues. The Court has considered the parties' arguments and thoroughly reviewed the administrative record. The Court's rulings follow a brief discussion of the facts.

## Background

At the time plaintiff made his long term disability benefits claim, he was an attorney with the law firm of Burr & Forman LLP. The firm's LTD policy is administered and maintained by Standard.[1]

1. The policy relevant to this action, No. 642895–B, was issued to Burr & Forman with an effective date of December 1, 2003. Plain-

Plaintiff was injured in a high-speed automobile accident on February 5, 2004, when the vehicle he was driving was struck from behind. He was transported by ambulance to the emergency room at Piedmont Hospital, where he was treated and released the same day. The attending physician diagnosed plaintiff with an injury to his back and neck and noted abrasions on his left hand and knee. (AR[2] at 1993.) He also diagnosed plaintiff with a "closed head injury with brief loss of consciousness." (*Id.*)

Following the accident, plaintiff obtained a neurological consult on March 19, 2004, with Dr. Michael Hartman. Dr. Hartman noted that plaintiff complained of "significant changes in mental status" since his accident and that his wife noted "serious problems with [plaintiff's] memory" since the collision. (*Id.* at 294.) Noting the fact that plaintiff's medical history was "unremarkable for any other serious illness," Dr. Hartman indicated that both the severity and duration of plaintiff's symptoms were exceptional for "a typical closed head injury with a cerebral concussion" and referred plaintiff for further testing. (*Id.* at 294–95.) Upon Dr. Hartman's referral, plaintiff received a neuropsychological evaluation by Damond J. Longsdon, Ph.D., the results of which were "consistent with the generalized effects of postconcussive syndrome combined with more localized effects of a right frontal injury to the brain." (*Id.* at 281.) Dr. Longsdon also recommended that "[g]iven his level of dysfunction, [plaintiff] should strongly consider seeking disability status for approximately 12 to 18 months." (*Id.* at 280.) On this recommendation, plaintiff stopped working in early October, 2004, and sought

LTD benefits soon thereafter on the basis of postconcussive syndrome.

According to the terms of the policy, because plaintiff had been covered by the plan for less than 12 months, he was "not covered for a[d]isability caused or contributed to by a pre-existing condition." (LTD Policy at 17.) Plaintiff's medical records revealed that he was treated for bipolar disorder during the relevant pre-existing condition inquiry period; therefore, Standard's claim investigation process focused on whether plaintiff's pre-existing mental illness caused or contributed to plaintiff's allegedly disabling brain injury. Citing the policy's pre-existing condition exclusion, Standard eventually denied plaintiff's LTD claim on September 16, 2005, about 10 months after it had been filed.

In March 2006, plaintiff initiated the appeal process. In May 2007, Standard had yet to issue a determination on plaintiff's appeal. In a letter dated May 2, 2007, plaintiffs's counsel indicated that if Standard did not notify him of their final decision on appeal within 10 days, that plaintiff would file suit. When no final decision was forthcoming, plaintiff filed the present action in district court on May 15, 2007.

In the first instance, the parties disagree as to whether the action is properly before the Court. Standard contends that plaintiff failed to exhaust his administrative remedies by bringing suit prior to receiving a final decision from Standard on appeal. According to Standard, plaintiff's claim should either be dismissed for lack of exhaustion or, alternatively, it should be remanded to Standard for issuance of a

tiff's coverage under the policy commenced in December 2003 when he began employment with the firm.

**2.** Defendant submitted its claim file as Exhibit 1 to the affidavit of Mark Sampson, Senior

Benefits Review Specialist. The Court will refer to documents within the claim file as the administrative record ("AR") for the purposes of this order.

final decision. Plaintiff argues that his claim is properly before this Court for one of two reasons: either because he exhausted his administrative remedies or because Standard violated ERISA regulations by failing to decide his claim in a reasonable and timely manner and failing to afford him a "full and fair review," and therefore he is "deemed" to have exhausted his administrative remedies. Standard disputes this argument by contending either that its claim-review process did not violate applicable regulations or, alternatively that it substantially complied with the applicable regulations. Assuming that the case is properly before the Court, the parties also disagree as to the appropriate standard of review. The Court will address each of these issues in turn.

*Discussion*

**1.** *Failure to exhaust administrative remedies*

Before bringing an ERISA claim for disability benefits, a claimant must exhaust his administrative remedies. *See Watts v. BellSouth Telecomms., Inc.,* 316 F.3d 1203, 1204, 1206 (11th Cir.2003); *Perrino v. So. Bell Tel. & Tel. Co.,* 209 F.3d 1309, 1315 (11th Cir.2000). In this case, Standard argues that plaintiff failed to exhaust his administrative remedies because he brought suit before Standard issued a final determination on appeal. Conversely, plaintiff argues that he exhausted his administrative remedies by fully participating in a single level of mandatory appeal.

█ In general, an ERISA plan is required "to establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination . . . under which there will be a full and fair review." 29 C.F.R. § 2560.503–1(h)(1). So long as a plan includes certain mandatory procedural protections, it is considered reasonable. The "Review Procedure" as set forth in Standard's LTD policy tracks the language

of the ERISA regulations insofar as it provides, in part, for:

1. a period of 180 days to request review of an adverse benefit determination;

2. an independent, non-deferential reviewer;

3. an initial review period of 45 days, which may be extended for an additional 45 days upon appropriate notification by Standard;

4. the tolling of the review period if a time extension is based on a claimant's failure to submit information "necessary to decide a claim" on review; and

5. the right to receive a written notice of denial containing an explanation for the denial, with reference to relevant parts of the policy or internal guidelines, and notice of the claimant's right to bring a civil action under section 502(a) of ERISA.

(LTD Policy at 20–21.) Because it is beyond dispute that plaintiff never received a written notice of denial on review by an independent claims reviewer, Standard contends that plaintiff filed suit prior to exhausting his administrative remedies under the plan.

█ In her letter of March 23, 2006, acknowledging receipt of plaintiff's request for review, Standard's claims analyst explained the following:

Because I am the person with the most knowledge of Mr. McDowell's LTD claim I am responsible for gathering information to complete the review of the decision to deny his LTD claim. Once the information is received it is then reviewed by me. If I am able to change the initial decision in Mr. McDowell's favor this will be done at [the] conclusion of my review. If the matter is resolved in your client's favor there

will be no need for referral to an independent reviewer. Conversely, if after reviewing the information I am unable to change the decision I will provide you with an explanation as to why we are unable to change it and send the file to the [Administrative Review Unit] for an independent review.

(AR at 1319.) Plaintiff argues that this "two-step review" process is inconsistent with the review procedures as outlined in the policy and constitutes an impermissible, unilateral modification of the plan. Furthermore, plaintiff argues that he exhausted his administrative remedies by fully participating in the reconsideration phase of the appeal, evidenced by the fact that the original claims analyst reconsidered and declined to change her initial denial on October 18, 2006. (*See id.* at 1489, 1501.) Standard acknowledges that the plan does not describe the intricacies of their internal review process. However, Standard contends that this is not a problem because the procedures are not a modification of the plan.

The Court does not find Standard's review procedures as described in the March 23rd letter to constitute an amendment to the plan. Standard's procedure of requiring an initial reconsideration by the original claims analyst upon a claimant's request for review does not alter the review process from the claimant's perspective. So long as Standard provides a timely, wholly independent review as promised in the plan, the claimant is receiving the procedural protections guaranteed by the plan and required by law. Standard acknowledges that the review process described in

the letter was intended to be completed within the appeal time frame provided in the plan. The Court has serious concerns regarding Standard's ability (in any but the most straightforward case) to complete its internal, two-step review process in the short time period prescribed by the plan and by the ERISA regulations. However, the impracticality of Standard's internal procedures does not bear on the question of whether plaintiff exhausted his administrative remedies. In his pre-suit correspondence with Standard, plaintiff's counsel portrays plaintiff's participation in the independent review as voluntary; [3] however, Standard made clear that the file on appeal was automatically passed along to the Administrative Review Unit for an independent review.[4] In other words, by triggering the review process, plaintiff did not have to voluntarily assent to the final, independent review. In sum, by participating in an initial level of review by Standard's original claims analyst, plaintiff did not complete the review process as provided in the plan. Accordingly, plaintiff did not exhaust his administrative remedies.

### 2. "Deemed" exhaustion

Plaintiff asks the Court to find that he is "deemed" to have exhausted his administrative remedies due to Standard's multiple violations of ERISA's procedural requirements during the claims process, including non-compliance with deadlines and denial of a "full and fair review." Standard denies that they failed to afford a "full and fair review" process, and insofar as they committed a technical breach

**3.** In a letter to the independent reviewer, plaintiff's counsel states, "Mr. McDowell has agreed to undergo Standard's Administrative Review of the denial-on-appeal." (AR at 1521.)

**4.** Standard's letter of October 27, 2006, notifying plaintiff that the original claims analyst

had been unable to change her decision states: "As we previously explained, now that we have gathered information and reviewed the decision to deny Mr. McDowell's claim his file will be forwarded to the Administrative Review Unit (formerly Quality Assurance Unit) for an independent review." (AR at 1492.)

of ERISA regulations, Standard argues that they substantially complied with the regulations, and that plaintiff's claim should therefore not be deemed exhausted.

Under the applicable ERISA regulation, if Standard failed to process plaintiff's claim in a reasonable manner, he will be excused from the exhaustion requirement and his claim will be properly before this Court. The "deemed exhaustion" regulation states in full:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section,[5] a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act [including filing suit in federal court] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503–1(*l*). Comparing the current regulation to the pre–2002 regulation that explicitly "deemed denied" claims that were not processed in a timely fashion, defendant argues that the current regulation containing language of "deemed exhaustion" does not operate to constructively deny claims in the same fashion. (*See* Def.'s Br. at 17.) The Court disagrees with defendant's interpretation of section 2560.503–1(*l*) and finds that the current "deemed exhaustion" provision is tantamount to a "deemed denial" under the pre–2002 regulations. *See Torres v. Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir.2003)(noting that current regulation is a modification of "deemed denial" provision); *Coates v. The Guardian Life Ins. Co. of America*, 2008 WL 269133, *2, 2008

U.S. Dist. LEXIS 7014, *10 (M.D.Fla.2008)(construing *Torres* and holding that "[t]he applicable regulations clearly permit the claimant to pursue his remedies of filing suit if the plan administrator has neglected to timely deny the claim, characterizing the situation as a 'deemed' exhaustion of administrative remedies"); *Stefansson v. Equitable Life Assurance Soc. of U.S.*, 2005 WL 2277486, at *9, 2005 U.S. Dist. LEXIS 21723 at *31 (M.D.Ga.2005)("the current regulation expresses the 'deemed denied' concept as plainly as the former regulation").

■ The next question for the Court is whether Standard has failed to establish or follow a reasonable claims procedure as required by the applicable regulations, thereby triggering the remedy set forth in section 2560.503–1(*l*). Plaintiff contends that Standard violated ERISA's regulatory requirements by (1) failing to timely render its initial claim decision; (2) repeatedly and unilaterally insisting on extensions by letters that lacked mandatory language; (3) referring plaintiff's administrative appeal to the same claims handler and medical consultants who denied his original claim; (4) failing to render a timely decision on appeal; and (5) refusing to produce "relevant documents" as required by ERISA regulations, thereby coercing plaintiff to participate in an otherwise voluntary appeal. (*See* Pl.'s Br. at 9–10.)

■ The Court will begin with plaintiff's third allegation regarding Standard's reliance during the appeal process on a claims analyst and medical experts who were involved in the initial adverse benefits determination. The regulations are clear that when the appeal process requires consultation with a medical expert, such an expert "shall be an individual who is neither an

---

5. The "requirements of this section" include, inter alia, timely benefit determinations, written explanation of adverse determinations, and the opportunity for appeal. *See* 29 C.F.R. §§ 2560.503–1(f), (g), (h).

individual who was consulted in connection with the [original] adverse benefit determination; nor the subordinate of any such individual." 29 C.F.R. § 5260.503–1(h)(3)(iii) & (v). The record indicates that the claims analyst referred plaintiff's file for review to Dr. Linda Toenniessen during the initial claims process and again after the initial adverse benefit determination. (AR 663–67, 835.) The second referral was made on March 10, 2006; however, plaintiff did not appeal the denial of his claim until March 16, 2006. (*Id.* at 835; 1848.) The parties appear to have been participating in an ongoing exchange of information between Standard's issuance of a denial letter in September 2005 and plaintiff's notice of appeal. To the extent that this medical review was not calculated to fulfill the requirement of an independent medical consultation as part of the review process (because no appeal had been filed at the time), the Court perceives no harm in this referral. The Court notes that the original claims analyst again asked Dr. Linda Toenniessen to review the file in September 2006, prior to her reconsideration and affirmation of her original denial based on plaintiff's pre-existing condition. (*See id.* at 902; 1501.) Based on the Court's earlier conclusion that Standard's reconsideration procedure does not violate ERISA regulations so long as it is timely and not offered as a substitute for a wholly independent phase of the appeal, the Court finds the repeat use of a medical expert prior to a truly independent review to be permissible under the regulations.

■ The majority of plaintiff's other allegations revolve around the theme of inappropriate delay. Because the Court finds that time line issues permeate this entire case, the Court will address these issues as a whole. The Court notes that

deadlines for the initial benefit determination and the review process in the current regulations are not absolute insofar as they must be viewed in conjunction with the tolling provisions also found in the regulations. Absent tolling and allowing for all possible extensions, an initial benefits determination must be made within 105 days and a decision on review must be made within 90 days. 29 C.F.R. § 2560.503–1(f)(3)(initial benefit determination) and § 2560.503–1(i)(3)(review determination). In this case, plaintiff sought disability benefits on November 11, 2004,[6] and Standard did not render an adverse benefit determination until September 16, 2005. Plaintiff requested an appeal of this determination on March 15, 2006, and Standard had yet to issue a final determination when plaintiff filed suit on May 15, 2007. While both phases of the claim process substantially exceeded the time frames provided in the regulations, if the deadlines were appropriately tolled, then Standard was still in compliance with the regulations. For the reasons discussed below, however, the Court has determined that plaintiff's allegations of inappropriate delay are well founded.

Throughout the claim process, Standard took the position that the deadlines for claim determination were tolled as long as they continued to demand information from plaintiff. (*See* Def.'s Br. at 18.) The Court finds Standard's position to be contrary to clear language of both the regulations and the plan.

Both the relevant regulations and the language of the plan indicate that it was improper for Standard to continue to rely on the tolling provisions once plaintiff had responded to Standard's request for information. The plan states: "If an extension is due to your failure to provide in-

---

**6.** This is the date indicated by plaintiff. (Pl.'s Br. at 3.) Defendant indicates, however, that plaintiff "advised Standard that he would be seeking long-term disability benefits" on October 29, 2004. (Def.'s Br. at 4.)

formation necessary to decide the claim on review, the extended time period for review of your claim will not begin until you provide the information *or otherwise respond.*[7] (AR at 21.) (Emphasis supplied.) Likewise, the underlying regulation states,

In the event that a period of time is extended ... due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination on review shall be tolled from the date on which the notification of extension is sent ... until the date on which the claimant *responds* to the request for additional information.

29 C.F.R. § 2560.503–1(i)(4)(emphasis supplied).[8] Ignoring the language of their own policy, Standard took this to mean that they could hold the claims process in abeyance until plaintiff produced the requested information. Contrary to Standard's position, however, under both the language of the plan and the applicable regulation, an extension period may only be tolled until the claimant *responds* to the request for additional information.[9]

This interpretation of the tolling provisions makes sense in light of the fact that tolling exists for the benefit of the claimant. Standard has unilateral authority to begin tolling an extension period insofar as Standard has discretion to determine what "necessary" information is lacking.[10] Standard also has the authority under the plan to deny a claim based on a claimant's failure to submit requested information. (*See* LTD Policy at 19.) However, once a claimant responds to a notification of tolling, Standard must continue to process the claim and appeal in accordance with the deadlines.[11] The Court appreciates that in an ideal world, a disability claim reviewer would have the claimant's complete medical records before him or her when deciding a claim. However, the regulations clearly contemplate that the clock will be running in less than ideal conditions.[12]

---

**7.** The policy contains a parallel tolling provision in the procedures for the initial claim determination. (*See* LTD Policy at 20.)

**8.** Tolling during the initial benefit determination process is similarly provided for in the regulations. 29 C.F.R. § 2560.503–1(f)(3).

**9.** The Department of Labor made the following comment regarding the current tolling provision: "This tolling period ends on the date on which the plan receives the claimant's response to the notice, *without regard to whether the claimant's response supplies all of the information necessary to decide the claim.* Once the claimant responds, the plan will have the benefit of the extension of time ( ... 30 days for disability claims) within which to decide the claim." Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed.Reg. 70246, 70250 n. 21 (Nov. 21, 2000)(emphasis supplied). This is the precise interpretation of the tolling regulation spelled out in the plan.

**10.** The plan confers "full and exclusive authority" on Standard to "interpret" the plan, and more specifically, it provides Standard "the right to determine ... [t]he sufficiency and the amount of information we may reasonably require to determine [entitlement to benefits]." (LTD Policy at 21–22.) The language of the plan, therefore, clearly confers discretion on Standard to determine whether it lacks "necessary" information, thereby allowing it to invoke the tolling provision.

**11.** To be clear, Standard may have been able to seek up to two 30–day extensions during the benefit determination process and a single 45–day extension during the appeal process if such extensions were "necessary due to matters to beyond the control of the plan"; however, *tolling* of such extension periods was only available if Standard made an appropriate, timely request for "necessary" information. *Id.*

**12.** For example, the clock begins running on both an initial claim determination and an appeal at the time of filing "without regard to whether all of the information necessary to make a ... determination accompanies the filing." 29 C.F.R. § 2560.503–1(f)(4) & (i)(4).

Standard's misapplication of the tolling provision was central to the delays in the appeal process. The back and forth between the claims analyst and plaintiff's counsel with regard to the medical records of Carol Moore and Dr. Mallory illustrate Standard's misuse of the tolling provisions. During the appeal, Standard was entitled to a *single* 45–day extension if the appeal determination could not be completed within the first 45 days. 29 C.F.R. § 2560.503–1(i)(1)(i) & (3)(i). In a letter dated April 27, 2006, Standard timely notified plaintiff that they were invoking the 45–day extension period due to the complexity of his claim and, in part, because plaintiff had failed to produce Dr. Mallory's and Carole Moore's records regarding their treatment of plaintiff. (AR at 1335–37.) On May 30, 2006, Standard notified plaintiff that they would proceed to complete the review with the information on file if plaintiff did not produce the information demanded in the April 27th letter. (*Id.* at 1338.) About a week later, plaintiff's counsel provided to Standard an independent medical evaluation ("IME") requested by his uninsured motorist insurance carrier. (*Id.* at 1340.) A month later, Standard acknowledged receipt of the IME and continued to demand the "information previously requested," which included the Mallory and Moore records. (*Id.* at 1346.) Counsel responded to this letter five days later on July 12, 2006, and indicated that he was "surprised" to learn that Standard was still waiting for those records and requested a firm commitment as to a deadline for rendering an appeal determination. In this letter, counsel stated clearly that plaintiff "[did not] intend to submit further information in connection with Mr. McDowell's appeal." (*Id.* at 1353.) Standard responded the following day by letter and indicated that the 45–day extension period had not begun because Standard was still waiting for the records requested on April 27th. (*Id.*

at 1360–61.) Standard took the position that they considered the missing medical records to be "pertinent" to the review process. (*Id.*) Standard also declined to provide a firm time line because of "variables over which we have no control, including ... the length of time the independent reviewer will require to perform a full and thorough review." (*Id.*)

Nearly a month later, on August 11, 2006, Standard again notified plaintiff that they were still awaiting the records. (*Id.* at 1396.) Plaintiff responded on August 23rd and argued that the Mallory and Moore records were "wholly irrelevant" to the pre-existing condition investigation: to the extent that Dr. Mallory treated plaintiff, it was in 2001, which was well before the relevant time period for the pre-existing condition inquiry, and Carol Moore was a minister who provided marriage counseling to plaintiff and his wife several years prior. (*Id.* at 1398.) Plaintiff added that the requested records may not even exist. (*Id.*)

Standard responded on September 14, 2006. On receiving the information that Carol Moore was not a licensed mental health professional, they withdrew the request for her records. Standard stood their ground with regard to Dr. Mallory's records, writing that such "pertinent" records "will assist ... Standard in evaluating the accuracy of your assertion [that no evidence existed that plaintiff displayed functional deficits prior to the collision] and provide physician reviewers with additional history." (*Id.* at 1404–05.) Standard also asserted that they could not obtain Dr. Mallory's records themselves, in part, because they did not know his full name and two psychiatrists with the last name "Mallory" practiced in the Atlanta area. (*Id.*)

Plaintiff's counsel responded several days later indicating that Dr. Lee's rec-

ords from 2003, which had been in Standard's possession for over a year, clearly identified "Dr. Jim Mallory" as someone who had treated plaintiff for depression prior to Dr. Lee, and therefore prior to the "look back" period. (*Id.* 1409, 1414–16.) Plaintiff's counsel also wrote, "Certainly Standard has enough information at its disposal to make a decision on the appeal. Standard's use of the absence of Dr. Mallory's records, having never requested the records directly from Dr. Mallory, smells of self interest and pure delay tactics." (*Id.* at 1415.) In their defense, Standard responded that plaintiff's counsel had previously disavowed any knowledge of Dr. Mallory, and was otherwise unresponsive to Standard's request for his records. (*Id.* at 1478.)

While the above discussion provides only sound bites from a lengthy and contentious chain of correspondence between the claims analyst and plaintiff's counsel, it is enough to illustrate the Court's point: it was improper for Standard to fail to start the clock on the 45–day extension period when plaintiff's counsel responded to Standard's request for the records. With regard to the "necessary" nature of the records, the claims analyst's characterization of the records as merely "pertinent" is apt. Certainly additional records portraying the manifestation of plaintiff's mental health problems prior to the accident may have shored up Standard's denial, but this is not the same thing as *requiring* the records to complete the appeal determination. Standard had long possessed psychiatric medi-

cal records from Drs. Bay and Lee that provided support for their position. To the extent that Standard's characterization of these records as "necessary" was an abuse of discretion, it would have been harmless had Standard started the clock on the extension period when plaintiff indicated on July 12, 2006, that he did not intend to submit anything further in support of his appeal. Instead, however, Standard continued to toll the time period for over two additional months until they obtained Dr. Mallory's records.[13] Standard was acting contrary to the plan and the regulations when they failed to start the clock on the 45–day extension period upon receiving plaintiff's letter of July 12, 2006.

■ While the above discussion focuses on Standard's misapplication of the tolling provision during the review process, the Court notes that the claims analyst and plaintiff's counsel engaged in a similar standoff during the initial benefit determination process. While plaintiff cooperated in providing Standard with extensive medical records early in the claims process,[14] Standard maintained that the deadline for claim determination was tolled until plaintiff provided additional information from his health insurance carriers. Standard erred by failing to start the clock on the first 30–day extension when plaintiff's counsel "responded" to the demand for additional information on May 20, 2005, by stating, "We see no reason to further delay processing of this claim merely to obtain the same provider information as has al-

---

13. On October 5, 2006, Standard wrote to plaintiff's counsel: "We are pleased to advise you that Dr. Mallory's medical records were received . . . on September 28, 2006. Therefore, the 45–day extension period to complete the review of Mr. McDowell's claim commenced on that date and will continue through November 11, 2006." (AR at 1478.) According to the Court's calculations, had the clock begun running upon receipt of counsel's

July 12th response, Standard's decision on appeal would have been due by late August 2006.

14. Standard's Medical Investigation Log indicated that the claims analyst had already received and reviewed plaintiff's pharmaceutical records along with medical records from 12 health care providers. (*Id.* at 1256.)

ready been provided [by the McDowells] from Mr. McDowell's health insurers." (*Id.* at 1253.) Despite this response, Standard delayed more than two additional months before finally starting the clock. A review of the record indicates that Standard seemed to be using the tolling provision to buy time for its own claim determination process.

Standard's gross misapplication of the tolling provision resulted in unacceptable delays and amounts to a "failure ... to follow claims procedures consistent with the requirements of [§ 2560.503–1]" such that plaintiff "shall be deemed to have exhausted the administrative remedies under the plan." 29 C.F.R. § 2560.503–1(*l*). Standard argues that plaintiff's claim should not be deemed exhausted because "Standard substantially complied with ERISA's time limitations." (Def.'s Br. at 17.) The Second Circuit Court of Appeals has taken the position that substantial compliance with ERISA regulations should never be able to "block or delay a plaintiff's access to federal court." *Nichols v. The Prudential Insurance Company of America,* 406 F.3d 98, 107 (2d Cir.2005). The *Nichols* court reasoned that "adopting the proposition that substantial compliance can delay accrual of the right to sue would permit plan administrators to indefinitely tie up claimants, who are often in need of immediate benefits, with ongoing requests for information." *Id.* While the *Nichols* opinion was rendered under an earlier version of the regulations that did not include the present tolling provisions, the court's concern regarding a plan administrator's ability to indefinitely tie up claimants with requests for information is equally applicable here. Because the Court finds that

Standard was not in substantial compliance with the deadlines provided in the regulations, the Court need not go so far as *Nichols* in holding that substantial compliance with deadlines never precludes deemed exhaustion. The Court notes that, while Standard did agree to put the review process on hold at a certain point to allow plaintiff to submit additional information,[15] this was well past the point in time when plaintiff was deemed to have exhausted his administrative remedies on account of Standard's misapplication of the tolling provisions.

Even assuming Standard properly applied tolling during the appeal process, Standard still failed to render a timely decision on appeal. When the time had nearly expired for Standard's decision on appeal,[16] plaintiff asked Standard to defer the review process in order to allow him to submit additional information in response to the denial on reconsideration. (AR at 1530.) On February 5, 2007, Standard received this information from plaintiff. From this point, the regulations and the plan allowed for, at most, a 45–day window to issue a final determination on appeal. Not until several weeks after the passage of the 45–day mark did Standard's reviewer refer plaintiff's file for an independent file review by a neuropsychologist. (*Id.* at 15548–51.) When plaintiff's counsel wrote to Standard on May 2, 2007, that he would file suit in ten days if Standard did not issue a final decision by that time, Standard had been reviewing plaintiff's latest submissions for nearly three months. The last correspondence plaintiff received from Standard prior to the May 2 letter did not provide a firm deadline for a decision. (*Id.* at 1560.) It is fair to say that plaintiff had

---

**15.** On November 7, 2006, counsel for plaintiff indicated that plaintiff would participate in the "voluntary" Administrative Review Unit process so long as he was given 90 days to present evidence. (AR at 1527.)

**16.** Assuming no "deemed exhaustion" Standard would have had 45 days from the receipt of Dr. Mallory's records on September 28, 2006, to issue a decision on appeal.

no realistic way of knowing when he would actually receive a final decision from Standard. *See Stefansson,* 2005 WL 2277486 at *12, 2005 U.S. Dist. LEXIS 21723 at *38. Thus, it was appropriate for plaintiff to file suit in reliance on the "deemed exhausted" regulation.

In sum, plaintiff is deemed to have exhausted his administrative remedies, and therefore, defendant's prayer for remand or dismissal on exhaustion grounds is denied.[17]

### 3. *Standard of review*

██ Plaintiff argues that since Standard has not rendered a final decision on appeal, no decision exists to which the Court could possibly defer, and therefore, *de novo* review of the administrative record is required. Additionally, plaintiff argues that a deemed denial should receive no deference because the plan administrator failed to properly exercise its discretion. (Pl.'s Br. at 20.) Defendant argues that the Court should apply the heightened arbitrary and capricious standard of review. Standard contends that they "made a good-faith effort to comply with ERISA's regulatory deadline while still attempting to provide plaintiff a reasoned and informed decision." (Def.'s Br. at 20.) As a result, Standard contends that their conduct was not so egregious as to result in being stripped of the discretion conferred on them by the plan. (*Id.*)

██ The Eleventh Circuit Court of Appeals has not ruled on the appropriate standard of review for a claim that is constructively denied. *See Torres,* 346 F.3d at 1332–33. The Court adopts the majority view that, "absent substantial compliance with the deadlines, *de novo* review applies on the grounds that inaction is not a valid exercise of discretion and leaves the court without any decision or application of expertise to which to defer." *See Nichols,* 406 F.3d at 109 (citing Ninth, Tenth, and Third Circuit opinions representing majority view).[18]

The Court finds the approach of the Tenth Circuit in *Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625 (10th Cir.2003), to be well reasoned and appropriate to the facts in this case. In *Gilbertson,* the court acknowledged that, "in the context of ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines and other procedural irregularities would not entitle the claimant to *de novo* review." *Id.* at 635. While the current tolling provisions at issue in this case were not in force in *Gilbertson,* the underlying rationale that "ERISA's procedural regulations are meant to promote accurate, cooperative and reasonably speedy decision-making" is equally applicable here. *Id.* *Gilbertson* explained that ERISA's regulatory deadlines play a "crucial role" in the "meaningful dialogue" required by the regulations as a whole:

> Although plan administrators may believe that they have articulated good reasons for their requests for more rec-

---

17. In light of this ruling, it is unnecessary for the Court to rule on whether Standard violated the "full and fair review" requirements contained in 29 C.F.R. 2560.503–1(h)(2) by allegedly refusing to produce "relevant documents" to plaintiff during the appeal process. (*See* Pl.'s Br. at 9–10, 16–17.)

18. Several district courts within the Eleventh Circuit have also adopted the majority view and have applied *de novo* review under simi-

lar circumstances. *See Coates,* 2008 WL 269133 at *2, 2008 U.S. Dist. LEXIS 7014 at *10–11; *Stefansson,* 2005 WL 2277486 at *11–12, 2005 U.S. Dist. LEXIS 21723 at *37. At least one district court declined to apply *de novo* review where a final appeal decision was untimely because the delay was due, in part, to the claimant's late submission of material for review. *Hamall–Desai v. Fortis Benefits Ins. Co.,* 370 F.Supp.2d 1283, 1293 (N.D.Ga.2004).

ords or additional diagnostic tests, from the claimant's perspective these requests are often indistinguishable from pointless stalling. In addition, the costs of delay are generally much higher for claimants, who may need disability benefits to buy their daily bread, than for plans and administrators. It would be manifestly unfair to claimants if plan administrators could extend the process indefinitely by continually requesting additional information. The deadlines therefore empower the claimant to call a halt to the evidence-gathering process and insist on an up or down decision on the record as it stands. It follows, then, that an administrator who fails to render a timely decision can only be in substantial compliance with ERISA's procedural requirements if there is an ongoing productive evidence-gathering process in which the claimant is kept reasonably well-informed as to the status of the claim and the kinds of information that will satisfy the administrator.

*Id.* at 635–36. (Internal citations omitted.) In *Gilbertson*, the court easily concluded that no meaningful dialogue took place because the plan administrator failed to communicate with the claimant for a six month period while the claim was under review. *Id.* at 636.

While the voluminous administrative record in this case, including over two years of correspondence between Standard and plaintiff, clearly sets it apart from the "radio silence" the claimant experienced in *Gilbertson*, the ongoing nature of the dialogue does not necessarily render it "meaningful." *See Stefansson*, 2005 WL

2277486 at *12, 2005 U.S. Dist. LEXIS 21723 at *38 (insurer's communications to claimant were not sufficiently "meaningful" so as to preclude *de novo* review). The tolling provisions empower a claimant to "call a halt to the evidence-gathering process" by responding to the plan administrator's request for "necessary" information and demanding a decision on the record as it stands. The record certainly demonstrates that the parties did engage in meaningful, productive evidence-gathering at some points during the claim process. However, as the Court has already discussed, much of the "dialogue" involved disputes about the relevance of requested records and plaintiff's concern with Standard's failure to provide a firm time line for a decision.

A more difficult question in this case is whether Standard was exercising its discretion under the plan when they improperly tolled the time period for making a final determination on appeal.[19] The Court finds that Standard's refusal to restart the clock when plaintiff responded (albeit without providing the requested information) to Standard's continued requests was contrary to the regulations and the plan and did not involve an exercise of discretion. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006) ("Because an administrator cannot contract around the procedural requirements of ERISA, decisions taken in wholesale violation of ERISA procedures do not fall within an administrator's discretionary authority.") As a result, Standard's repeated refusals to start the clock "consti-

---

19. The Court notes that *de novo* review is not rendered appropriate by the fact Standard agreed to delay the review process at a certain point to allow plaintiff to submit additional materials. Whether or not Standard was exercising its discretion at this point is irrelevant because the claim was already deemed exhausted. *Cf. Lamantia v. Voluntary*

*Plan Adm'rs, Inc.*, 401 F.3d 1114, 1123 (9th Cir.2005)(concluding that *de novo* review was inappropriate where delay resulted entirely from administrator's discretionary decision to grant extension in response to claimant's request for additional time to submit information).

tute[d] wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan." *Id.* Accordingly, *de novo* as opposed to heightened arbitrary and capricious review is required. Because the Court has determined that *de novo* review is appropriate in this case, the Court will not cut off the administrative record at the point in time when the suit was filed. The parties will have the opportunity to supplement the record as necessary.

### Summary and Conclusion

In summary, the Court's rulings on the requested issues are as follows:

1. Plaintiff has failed to exhaust his administrative remedies.

2. Due to Standard's failure to follow claims procedures consistent with the ERISA regulations, especially with regard to their failure to substantially comply with the deadlines for claim determination and review, plaintiff is deemed to have exhausted his administrative remedies.

3. The Court will exercise *de novo* review of plaintiffs's claim; therefore, the parties will be permitted to supplement the administrative record as appropriate.

In light of the above rulings and the well-developed state of the administrative record, the Court finds this to be an appropriate juncture for mediation of this dispute. The Court will appoint a qualified mediator in thirty (30) days unless the parties notify the Court that they have agreed upon a mediator.